1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

MELINDA ELLIS,                          :
                                        :
        Plaintiff,                      :
                                        :No. 3:09-cv-428-LRH-WGC
     vs.                                :
                                        :
ALESSI TRUSTEE CORPORATION, et          :
al.,                                    :
                                        :
        Defendants.                     :
_____       :


TRANSCRIPT OF JURY TRIAL - DAY 1
(Pages 1 through 162)


January 20, 2015


Reno, Nevada


Court Reporter:          Donna Davidson, RDR, CRR, CCR 318
                         Certified Realtime Reporter
                         400 South Virginia Street
                         Reno, Nevada  89501
                         (775) 329-0132

2

1                        A P P E A R A N C E S

2


3
    FOR THE PLAINTIFF:
4
    MARK J. BOURASSA
5   TRENT L. RICHARDS
    The Bourassa Law Group LLC
6   8668 Spring Mountain Road
    Suite 101
7   Las Vegas, Nevada 89117-4113
    (702) 851-2180
8   mbourassa@bourassalawgroup.com
    trichards@bourassalawgroup.com
9


10
    FOR THE DEFENDANTS:
11
    THOMAS JAMES BAYARD
12  Alessi & Bayard
    556 North Diamond Bar Boulevard
13  Suite 300
    Diamond Bar, California 91765
14  909-861-8300
    tjb@alessibayard.com
15
    STEVEN T. LOIZZI, JR.
16  Alessi & Koenig, LLC
    9500 West Flamingo
17  Suite 205
    Las Vegas, Nevada 89147
18  Phone: (702) 222-4033
    steve@alessikoenig.com
19

20

21

22

23

24

25

3

1          RENO, NEVADA, JANUARY 20, 2015, 9:14 A.M.

2                         --oOo--

3                P R O C E E D I N G S

4

5          THE COURT:  Good morning.  Have a seat, please.

6          COURTROOM ADMINISTRATOR:  Today is the date and

7     time for jury trial in civil case 3:09-cv-428-LRH-WGC,

8     Melinda Ellis versus Alessi Trustee Corporation, and

9     others.

10          Counsel, can you please state your appearances

11     for the record.

12          MR. BOURASSA:  Good morning, Your Honor.  Mark

13     Bourassa for Melinda Ellis, also known as Melinda James.

14          Trent Richards from my office, an attorney

15     admitted in Nevada who will be assisting today.

16          And the gentleman next to him is Mr. Hunter,

17     who -- excuse me, Mr. Blackburn, who is our technician.

18          THE COURT:  All right.  Thank you.  And for the

19     defense?

20          MR. BAYARD:  Good morning, Your Honor.  Thomas

21     Bayard and Steven Loizza.

22          MR. LOIZZI:  Good morning, Your Honor.

23          THE COURT:  All right.

24          MR. BAYARD:  On behalf of the defendant.

25          THE COURT:  Counsel, the obvious question is

4

```
 1   where have you been?  Why are you so late this morning?
 2   And I'm putting you on notice that you're at risk of
 3   contempt of court.  I want to know why you're here so late.
 4                  MR. BAYARD:  Your Honor, we had a little bit of
 5   trouble locating parking.
 6                  I had some bad information in terms of how long
 7   it would take to get here.
 8                  And then we got -- I have a pacemaker, which
 9   caused some additional problems of getting through
10   security.  They also had some trouble with our box of
11   documents.  There was a bunch of minor little delays that
12   involved us -- resulted in us being a few minutes late.
13                  THE COURT:  All right.  When did you arrive in
14   Reno?
15                  MR. BAYARD:  Yesterday at about 3:15, I believe.
16                  THE COURT:  All right.  Well, I'll accept your
17   explanation.  But I'm disappointed.  We have 26 jurors
18   waiting.  We have counsel on the other side.  We have court
19   staff ready.
20                  When I say 8:30, it means 8:30.
21                  MR. BAYARD:  Your Honor, I was -- and the error
22   is entirely on my office.  I was instructed to be here at
23   9:00.  And so we got here at about 9:02.
24                  And so I apologize to the Court, to the staff,
25   to Mr. Bourassa, and to everyone else.  That was bad
```

1    information on our side.

2              THE COURT:  Emphasize again that every pretrial

3    order and every trial order that's gone out on this case

4    has listed our start time at 8:30 in the morning.

5              MR. BAYARD:  My apologies, Your Honor.

6              THE COURT:  All right.  Have a seat.

7              Are there any issues that counsel would like the

8    Court to address before we bring in our jury panel?

9              MR. BOURASSA:  No, Your Honor.

10             MR. BAYARD:  None, Your Honor.

11             THE COURT:  All right.  Okay.  At this time,

12   we'll bring in the jury panel.

13             Madam Clerk, would you let me know when

14   everyone's here and we're ready to go.

15             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

16             Please rise.

17         (Recess from 9:18 a.m. until 9:24 a.m.)

18             COURTROOM ADMINISTRATOR:  Today is the date and

19   time for a jury trial in case number 3:09-cv-428-LRH-WGC,

20   Melinda Ellis versus Alessi Trustee Corporation, and

21   others.

22             Counsel, can you please state your appearances

23   for the record.

24             MR. BOURASSA:  Good morning, Your Honor.  Mark

25   Bourassa present with Melinda Ellis as well as Trent

6

1    Richards, an attorney from my office.  And Mr. Blackburn at

2    the end is our technician.  He'll be providing the visuals.

3               THE COURT:  All right.

4               And for the defense.

5               MR. BAYARD:  Good morning, Your Honor.  Thomas

6    Bayard and Steven Loizza on behalf of the defendants.

7               THE COURT:  All right.  And would you introduce

8    the name of your clients, the defendants, please.

9               MR. BAYARD:  Yes, Your Honor.  The defendants

10   are the Alessi Trustee Corporation; Alessi & Koenig, a

11   Limited Liability Company; and in the caption David Anthony

12   Alessi, although he is now a dismissed defendant.

13              THE COURT:  All right.  Thank you.

14              Ladies and gentlemen, I'd like to welcome you

15   here this morning.  We're in Courtroom No. 3 here of the

16   federal courthouse here in Reno.

17              And the first thing I would tell you is, of

18   course, my name is Judge Larry Hicks.  And I'll be

19   presiding over the trial that will be occurring here and

20   commencing this morning.

21              But I would tell you that this is a civil case.

22   It's a civil jury trial.  And it's estimated to last no

23   more than two to three days.  So it will definitely

24   conclude this week.

25              And just to give you an idea of what our

7

```
 1    schedule is, we start promptly in the morning.  Of course,
 2    we'll start just as soon as we're ready to go here this
 3    morning, and we'll go through the day.  There'll be breaks
 4    in midmorning, midafternoon.  There will be a lunch break
 5    from 12:00 to 1:30.  And we'll complete the day as close to
 6    5:00 as we can do so.
 7              And tomorrow morning we'll start promptly at
 8    8:30, and we'll go through until 5:00 with a similar type
 9    of schedule each day until we complete the trial.
10              That gives you an idea of the time requirement
11    that may be necessary on your parts, those of you who may
12    be chosen to serve on the jury.
13              But before we start with the jury selection, I
14    like to take a few minutes to explain some of the reasons
15    why you are here and why it's so important to have you here
16    and why we couldn't do what we do without having you here.
17              This all goes back to over 225 years ago to an
18    event no less important than the founding of our republic.
19              As you may recall from your history lessons in
20    school and perhaps in college, our forefathers, who lived
21    on this side of the Atlantic Ocean in the 1770s, were
22    citizens of Great Britain.  They had come to populate the
23    king's 13 colonies on the eastern seaboard.
24              And by 1776 these colonists had become very
25    frustrated with the rule of the king of England and also
```

1      the laws that were being imposed on them by the parliament

2      of England.

3                    You'll remember slogans such as taxation without

4      representation in conjunction with their frustration.

5                    As a result of all of that, the Declaration of

6      Independence was signed on July the 4th, 1776, and that's

7      become recognized as the birth date of our country.

8                    But the Declaration of Independence was involved

9      by eight years of war.  The War for Independence was fought

10     and won.  But afterwards our ancestors, now citizens of 13

11     states rather than 13 colonies, were isolated from the rest

12     of the world, and they were isolated from each other as

13     well.

14                   If you imagine what it was like back then with

15     no television, no radio, no effective source of

16     communication and citizens from these 13 states having very

17     little to bind them together to give them any strength or

18     any semblance of a nation of any kind, something that

19     had -- something had to be done that would be dramatic

20     before one of the nations in Europe may have come to

21     America and dominated these colonies and broken them down.

22                   It was in this atmosphere that the founders of

23     our country met in 1787.  And we've come to know such names

24     as Washington, Jefferson, Adams, Madison, Hamilton.

25     Benjamin Franklin was even one of the persons involved in

1    the framing of our Constitution.

2           They did that over the summer of 1776.  It took

3    them nearly three months.  They met in Pennsylvania and

4    Philadelphia, and they drafted and redrafted forms of our

5    proposed Constitution.

6           And if you've ever read and reviewed our

7    Constitution, you will see that nowhere in the Constitution

8    is there a word about what would be the rights of the

9    citizens under this new united government.

10           There was nothing about freedom of speech,

11    nothing about freedom of religion, nothing about protection

12    from unreasonable searches and seizures, nothing about the

13    right to due process of law, and nothing about the right to

14    a trial by jury.

15           It was a mark of the leaders of our country who

16    drafted this Constitution that they were able to persuade

17    the citizens that if they would ratify our Constitution

18    with no rights of the citizens spelled out, the first work

19    of the new Congress would be to list the rights of citizens

20    and submit them to the citizens for approval.

21           The ratification of our Constitution required 11

22    of the 13 states, and with the promise of this first work

23    by the new Congress, each one of the 13 states unanimously

24    approved our Constitution.

25           And as promised, our first Congress met and

1   drafted what we commonly call our Bill of Rights, which

2   became the First Amendment -- 10 amendments to our

3   Constitution.

4           Included within those 10 amendments are our

5   rights to freedom of religion, freedom of speech, due

6   process of law, and the very reason why you have been

7   summoned here today, the right to a trial by jury.

8           In civil cases the Seventh Amendment in the Bill

9   of Rights now the Seventh Amendment of our Constitution,

10  provides that if private citizens have a dispute, that they

11  will have the right to come in to court and have their

12  dispute heard and resolved by a jury of their fellow

13  citizens.

14          The democratic form of government created by our

15  Constitution has been a resounding success.  Our

16  Constitution today stands as a model of its kind over 225

17  years after its creation.

18          Countries which have gained independence over

19  the past two centuries have realized that they had to form

20  some document of self-government.  And the first place they

21  have looked to is our Constitution because it is the best

22  Constitution ever crafted by the hand of man.  And it has

23  worked better and lasted longer than any other form of

24  government since.

25          In 1900 there were only 10 countries in the

1     world with democratic forms of government.  Today there are

2     roughly 120, all of them having followed, in some fashion,

3     our constitutional form of government.

4              And that is why you are here today, because you

5     are citizens of northern Nevada and will ultimately compose

6     a fair and impartial jury to decide this case.

7              Although there are 26 of you here -- who are

8     here this morning, there are only seven of you who will be

9     chosen as jurors in this case.  A civil case calls for a

10    minimum, under our Constitution, of six jurors.  And we

11    customarily will have seven jurors when we have a short

12    trial such as this one.

13             And it will be necessary that we ask you some

14    questions in the interest of ensuring that each juror will

15    be completely fair and impartial.

16             We're not going to pry into any personalities or

17    rattle any skeletons in anyone's closet.  Most of what we

18    need is your name, where you work, what kind of work you

19    do, how you feel about this kind of case, and whether you

20    may have had any life experiences which may be related in

21    any way to the issues which may concern this case.

22             We need this information in order to come to a

23    mutual decision that, yes, it would be fair to ask you to

24    sit on the case and it would be fair to the parties and to

25    yourselves to make a commitment to serve on this jury and

1    decide this case as fairly as you can.

2              We will try not to waste your time or insult

3    your intelligence.  Whatever time it takes, hopefully you

4    will feel it is not time wasted but time invested in

5    participating and preserving a constitutional process that

6    is one of the cornerstones of our nation.

7              I'll now ask that the entire group of you please

8    stand and raise your right hands and be sworn for purposes

9    of our questioning this morning.

10             COURTROOM ADMINISTRATOR:  Do you, and each of

11   you, solemnly swear that you will well and truly answer all

12   questions put to you touching on your qualifications to

13   serve as a trial juror, in the case now pending before this

14   Court, so help you God?

15        (Prospective jurors responded affirmatively.)

16             COURTROOM ADMINISTRATOR:  Thank you.  Please be

17   seated.

18             THE COURT:  Okay.  Now, ladies and gentlemen, we

19   will call up into the jury box and into the first row of

20   the courtroom -- what is our number this morning?  Okay --

21   13 of you.  And you will all be able to be seated in the

22   jury box.  And I'll be directing my questions to the 13 of

23   you.

24             But it will be important that everyone in the

25   courtroom listen closely because if we excuse any of the 13

1    people, then someone will be selected randomly to fill that

2    spot.

3            I would also tell you that your names have been

4    drawn randomly by computer.  In the old days we used to

5    have a jury wheel here in the courtroom, and we would pull

6    the names out one by one.  But it took everyone more time.

7    And today we have names drawn randomly by our courthouse

8    computer.

9            And so those of you who have been selected will

10   be called by name as a result of that computerized process.

11           And I'll ask that the first one of you be seated

12   in the upper row on my end and that we'll fill that entire

13   row, and then we'll start on the lower row again from my

14   end.

15           Madam Clerk, would you please call the names of

16   our prospective jurors.

17               (Jury empaneled and sworn.)

18           THE COURT:  All right.  At this time, I want to

19   excuse those of you who have not been called or who were

20   excused from the jury panel.  But I want to thank each one

21   of you for being here this morning.

22           I have to tell you, we hear from time to time

23   about people trying to avoid jury duty or not wanting to

24   serve on juries.  But I don't see that here in northern

25   Nevada.  I mean, we send out our list of jury notices and

1      people show up.  And they're here and they're ready to go

2      and they're here on time.

3              Not only that, I see very responsive answers to

4      every question which we ask.  And this is a strong civics

5      oriented community that really recognizes the importance of

6      their duty as jurors.  And I want to thank each one of you

7      for being here this morning and certainly the jurors who

8      will be sitting on this case for being here as our jury.

9              Those of you who have not been selected, you're

10     excused now, and you may leave.  And I thank you very much.

11             Of course, all our jury trials are public and in

12     public courtrooms.  Anyone who wishes to stay is certainly

13     welcome to at any time they would like.  But I recognize

14     that you do have other things in your lives and you're

15     probably going to be leaving.  So I bid you ado with a

16     thank you very much for your service this morning.

17             All right.  Ladies and gentlemen, what I have

18     now are some brief instructions to you that will give you a

19     sense of how the law applies to what you'll be doing as

20     jurors, what your role is and what my role is.

21             And what I think I'll do, I'll go through these,

22     and then we'll excuse you over the lunch hour.  And then

23     we'll reconvene -- we might even have you back here at 1:00

24     for an early start with the actual trial.

25             But now that you've been sworn as the jury to

1    try this case, I'll briefly tell you something about your

2    duties as jurors and give you some preliminary instructions

3    regarding your conduct in this case.

4              At the end of the trial, I will give you more

5    detailed written instructions which will govern your

6    deliberations and will set forth the law that applies to

7    this case.

8              As jurors, it will be your duty to decide from

9    the evidence what the facts are.  You, and you alone, are

10   the judges of the facts.  The evidence presented to you

11   during the trial will primarily consist of the testimony of

12   witnesses and tangible items including papers or documents

13   called exhibits, as well as any facts on which the lawyers

14   agree or which I may instruct you to accept.

15             After hearing all the evidence, you will apply

16   the facts as you find them to the law to which I will give

17   to you in my written instructions at the end of the trial.

18   In this way you can reach a fair verdict which will be

19   based on the evidence in the case and a verdict which is

20   consistent with the instructions of law which you are

21   obligated to follow.  You've just taken an oath to follow

22   the law.

23             You should not take anything I say or do during

24   the trial as indicating what I think of the evidence or

25   what your verdict should be.  That is a matter which is

1    entirely for you, as jurors, to decide.

2            The evidence which will be presented to you

3    during the trial may be either direct or circumstantial.

4    Direct evidence is direct proof of a fact, such as

5    testimony by a witness about what that witness personally

6    saw or heard or did.

7            Circumstantial evidence is proof of one or more

8    facts from which you could find another fact exists.

9            You should consider both kinds of evidence.  The

10   law makes no distinction between the weight to be given to

11   direct or circumstantial evidence.  It is for you to decide

12   how much weight to give to any evidence.

13           Some evidence may be admitted during the trial

14   for a limited purpose only.  If I instruct you that an item

15   of evidence has been admitted only for a limited purpose,

16   you must consider it only for that limited purpose and for

17   no others.

18           Certain things are not evidence, and you should

19   not consider them as evidence in deciding the facts of this

20   case.  For example, the statements and the arguments of the

21   attorneys are not evidence.  Neither are questions or

22   objections by the attorneys.  Those are not evidence in the

23   case.

24           Testimony that I instruct you to disregard is

25   not evidence.  Additionally, anything you see or hear when

1    the Court is not in session is not evidence and must not be

2    considered by you in any way in determining what the facts

3    are in the case.

4              There are rules of evidence which control what

5    can be received into evidence.  When a lawyer asks a

6    question or offers an exhibit into evidence and a lawyer on

7    the other side thinks that it is not permitted by the rules

8    of law, that lawyer has an obligation to object.

9              If I overrule the objection, the question may be

10   answered or the exhibit may be received.  If I sustain the

11   objection, the question cannot be answered and the exhibit

12   cannot be received.  Whenever I sustain an objection to a

13   question, you must ignore the question and must not guess

14   what the answer might have been.

15             Sometimes I may order that evidence be stricken

16   from the record and that you disregard or ignore evidence.

17   That means that when you are deciding the case, you must

18   not consider the evidence which I told you to disregard.

19             In deciding the facts of this case, you may have

20   to decide which testimony to believe and which testimony

21   not to believe.  You may believe everything a witness says,

22   or part of it, or none of it.

23             In considering the testimony of any witness, you

24   may take into account:

25             One, the opportunity and ability of the witness

1    to see or hear or know the things testified to.

2              Two, the witness' memory.

3              Three, the witness' manner while testifying.

4              Four, the witness' interest in the outcome of

5    the case and any bias or prejudice.

6              Five, whether other evidence contradicted the

7    witness' testimony.

8              Six, the reasonableness of the witness'

9    testimony in light of all the evidence.

10             And, seven, any other factors that bear upon

11   believability.

12             The weight of the evidence as to a fact does not

13   necessarily depend on the number of witnesses who testify.

14             Similarly, because this is a civil case, during

15   the course of trial, there may be evidence offered in the

16   form of interrogatories or answers to interrogatories.

17             An interrogatory is a written question which is

18   asked by one party of another prior to the trial and the

19   other party must answer it under oath in writing.

20             Once again, unless I instructed you otherwise,

21   you are to consider interrogatories and the answers to them

22   just as if the questions had been asked and answered here

23   in the courtroom.

24             You should pay close attention to the testimony

25   and all evidence as it is presented because it may be

1   necessary for you to rely upon your collective memories

2   concerning what the testimony was when you retired to

3   deliberate on a verdict.

4           Although, as you can see, we have a court

5   reporter who is making a record of everything that is said

6   during the trial, typewritten transcripts cannot generally

7   be prepared for use by the jury.  So it's very important

8   that you pay close attention to the testimony and evidence

9   and not expect to have a typewritten transcript of

10  testimony before you when you deliberate this case.

11          On the other hand, all exhibits which are

12  admitted into evidence during the trial will be available

13  to you for your detailed study during deliberations.  So,

14  if an exhibit is received into evidence but it's not fully

15  read or shown to you at the time, do not be overly

16  concerned because you will get to see the exhibit later

17  during jury deliberations.

18          If you wish, you may take notes to help you

19  remember what witnesses said.  If you do take notes, please

20  keep them to yourself until you and your fellow jurors go

21  to the jury room to decide the case.  Do not let note

22  taking distract you from paying attention to witnesses and

23  paying attention to exhibits.  When you leave the

24  courtroom, your exhibits should be kept with you but left

25  in the jury room.  And they will be protected in the jury

1      room and will be available for you when you return.

2              Whether or not you take notes, you should rely

3      on your own memory of what was said.  Notes are only to

4      assist memory.  They are not evidence in the case, and you

5      should not be overly influenced by notes.

6              Because of your obligations as jurors to keep an

7      open mind throughout the trial, coupled with your

8      obligation to decide this case only on the basis of the

9      evidence presented and in accordance with the instructions

10     of law which I will give you, the -- I must instruct you

11     that during the trial you are not to discuss the case among

12     yourselves or with anyone else.  The discussion of the case

13     has to wait until all the evidence has been presented,

14     until you've heard everything that is to be presented, and

15     then that is the time for you to discuss it among

16     yourselves in the jury room in the course of deliberations.

17             And I must also instruct you that you are to

18     avoid listening, reading, or viewing any news account that

19     might pertain to this case.  I have no reason to believe

20     that there would be any media coverage of this case.  But

21     if for some reason there was, it obviously is something

22     that occurs outside the courtroom, and so it's your

23     obligation to completely ignore it.

24             As jurors you must decide this case based solely

25     on the evidence presented here within the four walls of

1    this courtroom.  This means that during the trial you must

2    not conduct any independent research about the case, any

3    matters in the case, or anything that may concern the case

4    or the parties or the individuals or corporations or

5    companies.

6              In other words, you should not consult

7    dictionaries or reference materials, you should not search

8    the Internet, go to websites, blogs, or any other kind of

9    electronic wireless communication to obtain information

10   about this case because that would be totally information

11   outside the courtroom that has nothing to do with the case

12   and, even more importantly, you all need to hear and see

13   the same evidence.  So keep that in mind at all times.

14             With regard to cell phones, I allow you to have

15   your cell phones.  They must be turned off in the

16   courtroom.  And, of course, you should not discuss the case

17   in any way with any outside parties, anyone outside the

18   courtroom.

19             Sometimes it's hard to keep it quiet.  But until

20   that verdict is in, until this case is deliberated, you

21   simply are not to discuss the case with anyone else.

22             You can use your cell phones for your personal

23   schedules just to advise home when you expect to be home or

24   something that might involve you which does not concern the

25   case at all.  You're certainly welcome to do that in the

1    hallways or in the jury room.

2              But beyond that, your cell phone use should be

3    restricted.  And everyone in this courtroom knows there are

4    to be no cell phones on in the courtroom.  So if you have

5    used your cell phone, be sure you shut it off before you

6    come back in.

7              If during the case you feel that it's necessary

8    to communicate with me regarding anything in the case, I

9    would ask that you simply write out a note and hand it to

10   the court clerk, Dionna, and she will see to it that it

11   gets to me.

12             Finally, I must instruct you that it's very

13   important that you reserve judgment on the case until

14   you've heard all the evidence.  We can only present one

15   witness and present one exhibit at a time.  And until

16   you've heard it all, you simply don't know what all the

17   evidence is in the case.  So keep an open mind.

18             And that's also important because you need to

19   get the instructions on the law before you instruct --

20   before you start discussing this case in deliberations.

21   And I will give you those instructions.  You will also have

22   those in the jury room with you as well as the exhibits.

23   And I'll read those instructions on the law to you before

24   the attorneys make their final closing statements in the

25   case.

1           This trial will begin when you come back from

2    the lunch hour.  And I've already outlined for you the

3    contentions of the parties.  But I remind you that that's

4    not evidence.  The only evidence that you may consider at

5    arriving in a verdict in this case is the evidence admitted

6    for your consideration within the four walls of this

7    courtroom.

8           We will start the trial with the opening

9    statements of the attorneys.  The plaintiff and counsel for

10   the defendants may make an opening statement or defendants

11   may, if they choose, reserve their opening statement until

12   after the plaintiff's evidence is in.  That's completely up

13   to them.

14          The opening statements of the attorneys are not

15   evidence.  As I mentioned before, anything the attorney

16   says or does in the courtroom is not evidence before you.

17   It may be designed to direct you to evidence, but the

18   evidence is what comes from the witnesses, from the

19   exhibits, or, in some cases, from the Court.

20          The opening statements of the attorneys are

21   simply a descriptive outline of what they expect the

22   evidence will show at trial.

23          The plaintiff will go first, and she will

24   present the plaintiff's evidence through her attorneys.

25   And after those witnesses or witness have testified and

1    that evidence has been admitted, the defense will have its

2    opportunity to call any defense witnesses or present any

3    defense exhibits that may be admissible in the courtroom.

4           After all the evidence has been presented, I

5    will provide you with those detailed instructions on the

6    law, and the attorneys will then have an opportunity to

7    make their closing statements to you which, once again, are

8    designed to assist you to understand what may or may not

9    have been presented in the case.  But it is not evidence in

10   and of itself.

11          At that point in time you will then retire to

12   deliberate in the jury room.

13          And what we will do now is I'm going to excuse

14   you.  And Ms. Negrete, our court clerk, will show you where

15   the jury room is.  And you will be free to come and go from

16   that before -- whenever you're excused from the courtroom.

17   And we'll call you in from there.

18          So please remember where you're seated in here

19   because you need to return to your same seats when you come

20   back in.

21          But because we're close to the lunch hour, I'm

22   going to excuse you at this time.  It's a little tight on

23   the lunch hour to have you here at 1:00, so what I would

24   like to do is start promptly at 1:15, if you could be back

25   by then.  I don't know if you're going out for a bite.

1    There's several restaurants in the area that are pretty

2    good as far as I know.  But I do ask that you be back and

3    ready to go at 1:15 because we will start promptly at that

4    time.

5              So with that bit of news, I'll excuse you at

6    this time.  Ms. Negrete will show you the jury room.  And

7    we will start promptly at 1:15.

8              COURTROOM ADMINISTRATOR:  Please rise.

9         (Jurors exit courtroom at 11:51 a.m.)

10        (The noon recess was taken.)

11                    *    *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              RENO, NEVADA, JANUARY 20, 2015, 1:20 P.M.

 2                              --oOo--

 3

 4          (Outside the presence of the jury.)

 5                  THE COURT:  Have a seat, please.

 6                  All right.  The record will show we're convened

 7      out of the presence of the jury.  I've been advised that

 8      counsel had a question or two for the Court.  So whoever

 9      has the question, go ahead, please.

10                  MR. BOURASSA:  Yes, Your Honor.  Mark Bourassa.

11      A couple of questions.

12                  First and foremost, prior to leaving the

13      building for lunch, we received, for the first time, the

14      Alessi binder of exhibits.  That's the first time we've

15      seen it, is about an hour and a half ago.

16                  And we were able to look at it in some ability

17      over the lunch period and have ascertained that a number of

18      the documents contained in that production are documents

19      that we may not have actually ever seen before in the

20      discovery process.

21                  I have conferred with Mr. Bayard, and his

22      representation to me, and I take it well, is that we may

23      have received the data with respect to some of those

24      documents, but the documents themselves may not have been

25      transmitted in the form that they've been provided to us
```

1   today.  Clearly it's several hundred pages.  I haven't had

2   an opportunity in an hour and a half to go through the

3   entirety of the binder, but it's something that is of great

4   concern on the plaintiff's side.  The production includes

5   documents entitled "Receipts," things that track the

6   accounting of various payments, the processing of payments,

7   distribution of payments to the association, as well as

8   ledgers that are updated and thus different than anything

9   that you've seen previously in the case.

10          That just is something of concern to us I wanted

11  to address with the Court and make a record of.  Obviously

12  I don't think we're going to get to those necessarily this

13  afternoon.  But it's something that we're going to have to

14  take a long hard look at after 5:00 today to try to figure

15  out what is or isn't something that we've actually had

16  exposure to.

17          The second issue that I would like to get

18  clarification from the Court on is in -- first in the

19  statement of the case I think that was provided by

20  defendant, they raised the issue of the bona fide error

21  defense.  As I recall, that is the first time I've heard

22  the bona fide error defense raised in this case.

23          It is my understanding, and we are happy to

24  provide a very short brief on the issue by tomorrow

25  morning, that the bona fide error defense is essentially a

1    defense to liability, not a defense to damages, and, as

2    such, we're concerned that going forward they're

3    essentially going to seek to retry the issue of liability

4    which, of course, this Court has already provided judgment

5    in favor of the plaintiff.

6              So I wanted to raise that with the Court as

7    well.

8              THE COURT:  All right.

9              Mr. Bayard?

10             MR. BAYARD:  Your Honor, three things.  First,

11   just as more of a housekeeping matter, and I should have

12   informed the Court of this before, I actually have -- I've

13   suffered four heart attacks in the last four years.  I'm on

14   a lot of medications.

15             One of the side effects of that medication is --

16   it's kidney medication, which necessitates frequent trips

17   to the restroom.  I mean no disrespect to the Court or the

18   jury.  I try and manage those trips the best that I can.

19   There are occasions, unfortunately, where the issue becomes

20   urgent.  And it's just one of the side effects of the

21   medication.  So I wanted to inform the Court of that.

22             In terms of the documents, most of the documents

23   that are included as part of defendant's exhibits, the vast

24   majority are Bates labeled, were previously produced to the

25   plaintiff.  One of the -- the tough issues in this case in

1     terms of presenting to the jury is because you've got

2     payments that were made over a long period of time, you

3     have charges that were incurred over a long period of time,

4     you have multiple entities that were involved in the

5     accepting and distribution of these payments, one of the

6     challenges is presenting that information in a

7     commonsensical way that the jury is going to be able to

8     digest, review, and ultimately make decisions on.

9            The documents that were not previously provided

10    to the plaintiff are simply current receipts that show the

11    distribution of payments.  These are payments that were

12    made by the plaintiff.  These are payments that the

13    plaintiff asserts were improperly divided.

14            Plaintiff has long been in possession -- because

15    of the fact that these go back to 2008 or before, the

16    plaintiff has long been in possession of the same

17    information showing that allocation of payment.

18            The additional documents which we plan on laying

19    the foundation for through testimony are simply another way

20    of showing that information broken down payment by payment.

21            And I would ask that plaintiff reserve any

22    objection that they have to those documents to -- if and

23    when they are sought to be either received or introduced

24    into evidence.

25            In terms of the bona fide error defense, I think

1    that the plaintiff is overinterpreting what this Court has

2    already ruled in the context of plaintiff's summary

3    judgment motion.

4            As the Court may recall, plaintiff was pro per

5    when she filed her summary judgment motion.  She actually

6    referenced a single document in her motion, and I believe

7    it's document 149 on the docket, where she contested, or

8    asserted, that the required debt collector language was not

9    in there.

10           Mr. Bourassa stepped into the case in between

11   the motion and the reply.  And so whereas the motion itself

12   was drafted by the plaintiff in pro per, the reply was, in

13   fact, drafted by Mr. Bourassa.  There was additional

14   evidence and documents submitted.

15           But if you look at the FDCPA, the liability

16   determination is -- which results in almost necessarily an

17   award of damages, is really a two-pronged analysis.  And

18   the plaintiff carried the burden of showing the actual

19   violation of the statute, in this case the failure to

20   include the debt collector language.  That is the only

21   issue that was addressed by the Court in the summary

22   judgment ruling.

23           Once that's found, then what the case law and

24   what the statute itself says is that the burden then shifts

25   to the defendant to show -- if they're asserting the bona

1    fide error defense, the burden shifts to the defendant to

2    show the factual basis for that defense as it relates to

3    the provisions of the statute.

4              And we're also happy to submit a brief on the

5    issue.  We did submit a jury instruction on the issue.

6              But I don't believe that the Court's analysis

7    with respect to the first prong; in other words, showing

8    that there was, in fact, a technical violation of the

9    statute, means that the defendants are foreclosed from

10   presenting evidence that despite that technical violation,

11   that there's an excuse from damages based on the fact that

12   there were reasonable procedures in place designed to

13   prevent these type of errors and that it was, in fact, a

14   mistake and not a result of either intentional conduct or

15   some sort of systemic flaw.

16             So the Court has addressed that first step.

17   Because if you don't have a violation, then there's no need

18   to get to bona fide error.  The Court has -- it's where the

19   Court has found there was a violation, the very

20   fact-intensive inquiry as to whether or not there were

21   sufficient procedures in place and whether or not there was

22   an actual bona fide mistake, that's still on the table.

23             I remind the Court that in the plaintiff's

24   motion for summary judgment, she also sought summary

25   judgment for breach of the fiduciary duty.  In this Court's

1    order the Court says, Wait a minute, this was an

2    adversarial relationship.  There's no way that this was a

3    fiduciary relationship.

4         So if the Court is going to foreclose the

5    defendants from addressing issues of bona fide error, then

6    at minimum the Court, I believe, should revisit that order

7    and instruct the plaintiff that they're also barred from

8    presenting any information or testimony or evidence on the

9    fiduciary relationship because the Court has also addressed

10   that in its order.  And that's document 141.

11              THE COURT:  Mr. Bourassa?

12              MR. BOURASSA:  Yes, Your Honor.  With respect to

13   the bona fide error defense, having litigated untold

14   numbers of these on both the plaintiff and the defense

15   side, that is a defense raised when liability is at issue.

16   Our position, quite simply, is that it was not raised in

17   the motion for summary judgment and was therefore waived.

18              To the extent I hear an invitation from

19   Mr. Bayard to retry or to expand the scope of our

20   prosecution of the Fair Debt Collection Practices Act, I

21   don't have any problem at all with that.

22              There's far more beyond a letter at issue here.

23   But the fact of the matter is under the Fair Debt

24   Collection Practices Act you only get one recovery for no

25   matter how many violations they were against one defendant.

1              So with respect to a damage claim and with

2    respect to the economy of the Court, the liability has been

3    determined on a single letter for a single clause is

4    inconsequential if we go out and prove that there are 30

5    letters or 40 letters or other issues that would violate

6    the Fair Debt Collection Practices Act.  It doesn't impact

7    the calculation of our client's damages as the statutory up

8    to a $1,000 award and then actual damages on top of that.

9              And so that being said, we will just stand on

10   the fact that the bona fide error defense has been waived

11   and shouldn't be presented.

12             THE COURT:  Well, a couple of points here.

13             First of all, the Court has ruled as a matter of

14   law that the defendants are in the violation of the FDCPA

15   in connection -- certainly in connection with the one

16   letter that was before the Court.

17             As I sit here, I don't recall if I was

18   addressing more than one letter, but I certainly knew as to

19   the one letter the Court clearly held that that was a

20   violation of the act.  And that is foreclosed.  That's a

21   ruling of law which the parties are going to have to deal

22   with.

23             With regard to the issue of intent, it -- intent

24   is relevant to the jury in determining the amount of

25   damage.  It's not relevant to the jury in determining

1     liability because the Court has already determined

2     liability by virtue of the motion and the order which was

3     filed.  I believe it's 149.  But whatever it was.

4               The -- with regard to the exhibits and the

5     binder, that concerns me greatly because for reasons which

6     were never presented, explained, or documented to the Court

7     at all, the defendants took no role in the preparation or

8     proposal of the Court's pretrial order in this case.  And

9     it's beyond me why that didn't happen and why relief wasn't

10    sought from that at the time.

11              But the pretrial order in these cases is the

12    roadmap to these trials.  And one of its most obvious and

13    specific purposes is to identify all exhibits and witnesses

14    proposed to be called by each party.

15              And the Court wound up -- I'm looking at my

16    document 147 in November of 2013 -- ruling that the Court

17    will adopt plaintiff's proposed pretrial order as the

18    Court's final pretrial order.  Any proposed modifications

19    will require a motion and showing of good cause.  It is so

20    ordered.

21              I mean, that order of the Court's over a year

22    and two months old.  And there's been no relief sought from

23    it in any way.

24              The only way that evidence be not identified in

25    the pretrial order can be admitted is if considerations of

1    manifest injustice are present to the party who's being

2    disabled from presenting the evidence.  And the Court's

3    view, although I'm willing to look at each and every

4    exhibit that may be offered here, is that I don't see

5    manifest injustice to the plaintiff if a document is being

6    offered by the defense that is either the same as the

7    document identified by plaintiff or is the document which

8    was produced in discovery in this case.

9           Because in that case I think the plaintiff would

10   be aware of it, and fundamental notions of fair play

11   require, in the Court's view, that the defense be

12   offered -- be allowed to offer such an exhibit if, in

13   fact -- if it, in fact, has been previously produced and it

14   can be can demonstrated that the opposing side was in

15   possession of it.

16          Much the same goes for the witnesses.  I know

17   we're talking about a handful of witnesses here, three, I

18   believe, maybe four.  And my gross impression is that

19   plaintiff's counsel have been aware of those witnesses and

20   the potential of those witnesses, and so I don't see that

21   they should be barred from the case because I don't see any

22   prejudice to plaintiff.

23          But that then leads to another issue, and that

24   is obviously documents which might be offered by the

25   defense that have not been previously produced in

1    discovery.  And I would tell you that the defense is going

2    to have to make a convincing case that manifest injustice

3    would occur if it was not allowed to present such evidence

4    and plaintiffs are incapable of showing that it would be

5    manifest injustice to them if they were, in light of, for

6    example, not even knowing of the existence of a document

7    prior to the day of trial, when arguably it should have

8    been identified a year and three months ago in the pretrial

9    order.

10            So that's where I stand on that.  I think it's

11   safe to assume that if you have a document -- first of all,

12   I want the defense to review their documents with

13   plaintiff's counsel before they're called out -- off in the

14   jury -- in the presence of the jury.  Because I want to

15   know if there are documents which are in dispute.  And I

16   don't want that -- that -- any delay or frustration

17   becoming a problem for the jury.

18            And I will send the jury home early if I have to

19   or we'll stay late this evening or we'll come in early

20   tomorrow morning, whatever the case may be.

21            I am not a judge who wants the jury sitting in

22   the jury room while we're hashing out those kinds of

23   fundamental questions.  So I'm going to leave it to counsel

24   to address those issues in a way that does not interfere or

25   damage the case.

1          I think I said, but just to be clear, insofar as

2    intent is concerned, insofar as any violations of the act,

3    I think that that's a fair issue of admissibility on the

4    issue of damages but not on liability.  So some of this is

5    where we are.

6          MR. BAYARD:  Your Honor, on the issue of

7    fiduciary duty, given the Court's previous ruling, is that

8    still at issue?

9          THE COURT:  Oh, yes.  I didn't address that.

10   Well --

11         MR. BAYARD:  And I can read to the Court --

12         THE COURT:  No, no, I'm well familiar with the

13   order.  But what I did was I denied plaintiff's motion for

14   summary judgment wherein she was seeking summary judgment

15   on the issue of fiduciary duty, and I held that there had

16   been no showing of any fiduciary relationship.

17         And there was no way under the circumstances of

18   this case and the undisputed evidence which is before the

19   Court that a debt collector serves in a fiduciary capacity

20   to a plaintiff.

21         Now, I don't -- I don't know if plaintiff has

22   other evidence that they intend to offer on the fiduciary

23   issue.  But I -- addressing the order itself, I was not --

24   that was not a ruling on the merits, so to speak, it was a

25   ruling on plaintiff's motion for summary judgment.  And I

1    was denying summary judgment based upon that conclusion of

2    the Court.

3            But to take it the next step and say that was a

4    judgment in favor of the defense is not anywhere I'm

5    prepared to go when there wasn't even a motion or a

6    countermotion for summary judgment.

7            So that is my view on the law.  I don't know

8    what the evidence is going to be on this case.  But if the

9    evidence turns out to be that the Alessi defendants were

10   nothing more than debt collectors serving in a debt

11   collection capacity on behalf of the ArrowCreek Homeowners

12   Association, there's no fiduciary capacity.  I don't know

13   the extent and the role of what they were doing or how they

14   were doing it.  I mean, that's evidence that has not been

15   presented before the Court.

16           And I would assume that if plaintiff is intent

17   on pursuing that theory that you in good faith have some

18   evidence that would bear upon that issue.  But I'm not --

19   I've got to hear the evidence first.

20           MR. BAYARD:  Okay.  Thank you, Your Honor.

21           THE COURT:  Further questions?

22           MR. BOURASSA:  Not at this time, Your Honor.

23           THE COURT:  Okay.  Let's bring the jury in,

24   please.

25           MR. BOURASSA:  Thank you.

1           COURTROOM ADMINISTRATOR:  Yes, Your Honor.

2        (Jurors enter courtroom at 1:41 p.m.)

3           THE COURT:  Have a seat, please.

4           The record will show that we are reconvened.

5   Counsel and the parties are present and the jury is

6   present.

7           Ladies and gentlemen, I'm sorry for the delay

8   that's occurred here.  I would tell you that in the course

9   of just about every trial there's one or two occasions

10  where the Court has to have a mini hearing in front of the

11  attorneys just to make sure everyone's on the same page

12  about how this case is being presented.  And that's what

13  has just occurred.

14          I would tell you that we started promptly --

15  actually a little before 1:15, and it took us a little

16  while to get through that.  That could happen again.  I

17  don't know that it will.  But these are common in a trial.

18          And I would tell you that I am a judge who is

19  very mindful of jury's time.  And I will not be wasting

20  your time while you're sitting in that jury room and

21  something isn't getting done out here.  I can assure you of

22  that.

23          And to the extent I can, if I have to have a

24  hearing that shouldn't be in front of the jury -- and these

25  are common, don't infer anything from that, because I can

1     tell you that in almost every trial there have to be some

2     hearings outside the presence of the jury.  But I will

3     attempt to schedule those after you go home or before you

4     come in in the morning or even over the lunch hour.  I do

5     everything I can to maximize your time.

6              So bear with us.  I'm sorry we've lost a half

7     hour of your time.  And I'm mindful with that.  But I can

8     confirm with you that it's for a good purpose.

9              So where we are at this point is to begin the

10    plaintiff's -- begin the trial.  And that begins with the

11    opening statements, as I mentioned earlier.

12             And, Mr. Bourassa, are you --

13             MR. BOURASSA:  I am, Your Honor.

14             THE COURT:  -- ready to go forward?

15             MR. BOURASSA:  Yes, Your Honor.  Thank you.

16             Ladies and gentlemen of the jury, my name is

17    Mark Bourassa.  I have the privilege of representing

18    Melinda Ellis, along with Mr. Richards, an attorney from my

19    office.

20             And I think during the preliminary introductions

21    you may have heard Hunter Blackburn's name.  Mr. Blackburn

22    makes all of the electronic gizmos and gadgets in the

23    courtroom work appropriately, whereas the rest of us are

24    literally all thumbs when it comes to that.

25             Let me first take a second to thank you so much

1    for your service.  It is always a challenge to come to a

2    situation like this, deal with the imposition on your time

3    and imposition on your lives.  And I'm sure both tables

4    appreciate the fact that you're here.

5              It's my understanding a couple of you served in

6    the military.  Thank you very much for your service.

7              Those things being said, what this case is about

8    is about one of the most fundamental rights as an American,

9    that is property ownership.

10             And what you're going to see in this case is a

11   lot of evidence related to the obligations of being a

12   property owner up here in Nevada.

13             What you're going to see is evidence of Melinda

14   Ellis making a really substantial investment in living in

15   the community that she's lived in for 30 years and

16   purchasing a house and a little investment property and

17   hoping for the best.

18             And what you're going to see is that evidence

19   that Ms. Ellis is familiar with the homeowners'

20   associations and familiar with the homeowners' association

21   obligations and familiar with the whole process of paying

22   those dues and getting benefits for those dues.

23             But as we all know in those middle 2000s, the

24   boom years, everybody was happy, things were going well.

25   And then things started to slide.

 1            Ms. Ellis is going to come up on the stand and

 2   she's going to tell you about her circumstances at that

 3   time.   And Ms. Ellis is going to tell you how she faced

 4   some financial problems and that she did, in fact, fall

 5   behind on the HOA payments for both of the properties

 6   within this ArrowCreek subdivision.

 7            Ms. Ellis is going to have the opportunity to

 8   explain what happened, to you, so that you understand what

 9   her -- I'm sure what a number of other folks up here in

10   Washoe County, Nevada, United States have gone through.

11            She's also going to explain to you what she's

12   done about it since.   And that is Ms. Ellis has done what

13   we all would want to do, I think, is she wants to pay what

14   she owes.

15            But this is America, and we don't pay more than

16   we owe.   That's what this case comes down to.

17            Because when she fell behind on those payments,

18   the evidence is going to show that a company called Alessi

19   Trustee Corporation started putting liens on her property.

20   And they put liens on her property for what they alleged

21   were those past due fees.   And the evidence is going to

22   show that they started adding thousands upon thousands upon

23   thousands of dollars of fees, of attorneys' fees, of other

24   charges so they put Ms. Ellis in a situation where she

25   couldn't even tell how much she actually owed the

1    association versus how much she owed, or purportedly owed,

2    Alessi Trustee Corporation.

3           You're going to see evidence that Ms. Ellis in

4    making her payments made every effort to work out a

5    resolution with Alessi Trustee Corporation.  She, in fact,

6    made payments trying to make that happen, but that Alessi

7    Trustee Corporation continued to add more and more charges

8    to her account as she went along.

9           In fact, ladies and gentlemen, you're going to

10   see evidence that Alessi Trustee Corporation would file

11   repeated liens on her property or would send her repeated

12   notices of default in the mail where, for example, for one

13   month to the next the amount demanded might jump $1,000, or

14   in some instances jump 4- or 5- or $8,000, where in some

15   instances in one month they would ask for $12,000 and a

16   year later ask for $32,000.

17          And all along you're going to hear Ms. Ellis

18   explain that she called them, that she sent them letters,

19   that she e-mailed them, and she tried to get an accounting

20   of her situation.  You're going to hear her tell you she

21   was unable to do that.

22          As the process went along, you're going to hear

23   evidence, again, from Ms. Ellis that she could see the

24   clouds on the horizon with -- the real estate market was

25   getting a little bit difficult.  And, of course, 2005,

44

1    2006, 2007, she decides now's the time to get out of the

2    real estate market.

3              And you're going to hear Ms. Ellis tell you that

4    she listed her properties for sale and that she tried to

5    sell those properties, that she talked to real estate

6    agents, and that because of the liens that were placed on

7    her property and because of her unwillingness to just give

8    money away to people that couldn't account for what they

9    were claiming they were owed, she was unable to sell that

10   property.

11             So we're going to see that time has gone by.  As

12   we all know, property values have plummeted.

13             You're going to hear Ms. Ellis testify about

14   those issues related to her properties.  And you're going

15   to hear Ms. Ellis testify about what she wants to do with

16   those properties to this date.

17             So that being said, we're going to go through a

18   few categories of testimony with Ms. Ellis.  She's going to

19   tell you a little bit about herself.  She's going to tell

20   you about the trouble that she's had in terms of financial

21   issues.  She's going to tell you about trying to climb out

22   of that hole.  And she's going to tell you about the

23   problems that she's had with Alessi Trustee Corporation.

24             Forgive me.  It's going to get confusing because

25   you've got Alessi this and Alessi that.

1               She's going to tell you about Alessi & Koenig,

2     LLC, which is the law firm.

3               And throughout that process, I apologize for

4     this because I went to law school, not to math school,

5     we're going to go through a lot of numbers.  And we're

6     going to look at a lot of checks.

7               And we're going to see that Ms. Ellis was

8     writing checks.  We have copies of them and copies of the

9     endorsements on them where she was specifically asking the

10    money she paid to be applied to her homeowner association

11    dues.  And that's not what happened.

12              Alessi Trustee Corporation would take that

13    money.  Alessi & Koenig would take that money.  And ledgers

14    don't reflect how much she actually paid when it comes down

15    to how much went to this Alessi, how much went to that

16    Alessi, and how much went to her actual dues.  And one of

17    the reasons for that, one of the reasons why she's still in

18    that today, you're going to hear that testimony.

19              And you're going to actually have an opportunity

20    to hear from Mr. Alessi himself.  And Mr. Alessi is going

21    to come in here and, I'm sure, try to talk his way through

22    the situation.  His testimony is whatever it is.

23              But Mr. Alessi's going to have to answer

24    questions about why the Nevada Department of Financial

25    Institutions issued a cease and desist order against Alessi

1    Trustee Corporation in 2008, I believe.  And he's going to

2    have to account for what happened to Ms. Ellis' money.

3    Where did it go?  Did it go to the right place?  Did it go

4    to the legal place?  Those are the questions we're going to

5    be asking Mr. Alessi.

6            If you didn't know, Mr. Bayard here, who I've

7    known over the course of this case, will also be

8    testifying.  He is an attorney with the Alessi & Koenig

9    firm.

10           And it's a little weird in a case like this to

11   be calling opposing counsel to the stand.  I'm sure he'll

12   do the best that he can.  We'll be asking those same

13   questions to him:  Where is this accounting?  How do we

14   know how much she paid?  How do we know how much she owed?

15   How could she have known that in 2007, when she was asking,

16   or 2008, when she was asking, 2009, 2010?

17           And, in fact, ladies and gentlemen, the evidence

18   is going to show there are still liens on her property

19   today still clouding her title.

20           So what we have in this case, ladies and

21   gentlemen, is we have currently three claims for relief,

22   three causes of action, if you will, as to areas that

23   Ms. Ellis thinks that -- or is asking you to find that

24   Alessi has done wrong.

25           The first issue listed in her complaint is

1      breach of a fiduciary duty.  And you're going to hear

2      Ms. Ellis provide evidence to you that she is, in fact, a

3      member of the ArrowCreek Homeowners Association.  And so as

4      a member of the association, while it's really awkward in

5      this circumstance, the Alessi & Koenig law firm represents

6      her as part of the association.

7                    And she is going to tell you that she has an

8      expectation that the Alessi & Koenig law firm or Alessi

9      Trustee Corporation before that, because of that very

10     strange but very unique situation, has a heightened

11     financial responsibility to be accountable to her about

12     what they do when they take her money.

13                    They have an obligation to show her, to account

14     for, and to keep proper records of what happens to the

15     money, where it goes.  So we'll be addressing that.  We're

16     going to say, I'm sure the evidence you'll hear will show,

17     that Ms. Ellis believes that they've breached that duty

18     because they can't account for the money.  And, in fact,

19     they still have liens on her property.

20                    We have a second claim under the Fair Debt

21     Collection Practices Act.  The Fair Debt Collection

22     Practices Act encompasses all kinds of rules and

23     regulations related to how an entity like Alessi Trustee or

24     Alessi & Koenig can collect debt.

25                    Now, the judge has already read to you in the

1    initial statements of the case that this Court has found

2    already, as a matter of law, that Alessi has violated the

3    Fair Debt Collection Practices Act and that the issue left

4    for that particular claim is not a question of liability

5    but is a question of damages.

6              So we'll go through some of the information on

7    that, and we'll present that evidence to you.  You'll have

8    an opportunity to make a determination at that time on two

9    components of damages under the Fair Debt Collection

10   Practices Act.  One is a statutory award of up to $1,000

11   and one is basically an award of whatever damages you

12   believe she's incurred, her actual damages.

13             So we'll talk about that.  She'll talk about her

14   issues with selling the property, what the valuation was.

15   And we'll go forward with evidence on that claim.

16             The third claim, and it always confuses people,

17   is a claim of racketeering.  And it's a civil racketeering

18   case, so we're not going to have mobsters or gangsters or

19   anything like that in here.  Al Capone is long gone, so we

20   won't deal with that.

21             But what we have is we have a problem in the

22   accounting of Alessi, either the trustee corporation or the

23   law firm -- I'm going to get them confused, and I apologize

24   for that -- of taking money that they are not entitled to.

25   And as a result, because they've done it on a number of

**49**

1  occasions, because it is their practice, we're going to

2  present evidence that's going to show you, and, of course,

3  the judge will instruct you on the law for the issue,

4  exactly how racketeering applies to the case and exactly

5  why each Alessi entity has engaged in that conduct.

6           And as a result of that, at the end of the case,

7  we're going to be asking you for additional damages for

8  that.

9           And at the very, very end of all of that, we're

10  going to ask you to award punitive damages to punish Alessi

11  Trustee Corporation and Alessi & Koenig for their behavior

12  and their failure to account properly under the rules of

13  the State of Nevada for the monies that they took and the

14  monies that should have been credited to Ms. Ellis.

15           And so, ladies and gentlemen, we're going to

16  take some time, it's going to be awfully boring on some of

17  the subjects, especially the accounting parts.  And for

18  that I sincerely apologize.  Those are issues that simply

19  have to be put before you in order to prove the case.

20           And so I really, really appreciate your patience

21  in sitting through the process, keeping your attention up,

22  and trying to follow along.

23           At the end of the day, Ms. Ellis is going to be

24  asking you for $1,000 of statutory damages, which is the

25  maximum allowed under the Fair Debt Collection Practices

1     Act statutory damage issue.

2                She's also going to be asking you for $512,000

3     in actual damages, under whatever theory you think is

4     appropriate, whether you think that's the breach of

5     fiduciary duty, whether you think that that's the Fair Debt

6     Collection Practices Act, or whether you think that's the

7     racketeering claim.

8                And on top of that, she's going to ask you to

9     award whatever you deem appropriate as a punitive damage to

10    prevent Alessi or Alessi from doing this again.  Thank you.

11               THE COURT:  Thank you, Mr. Bourassa.

12               The defense now has the right to make its

13    opening statement at this time.  Or they may reserve that

14    right.

15               MR. BAYARD:  We'd like to --

16               THE COURT:  Mr. Bayard?

17               MR. BAYARD:  I'm sorry, Your Honor.  We'd like

18    to make our opening statement now, if it pleases the Court.

19               THE COURT:  All right.  Go ahead, please.

20               MR. BAYARD:  Good afternoon, everyone.  I've

21    known Mr. Bourassa for a number of years now, and this is

22    the first time I've had the opportunity to see him in

23    court.  He's a tough act to follow.  He's -- pretty sharp

24    there, Mark.

25               But as much as I like Mr. Bourassa personally, I

1    do have to take issue with many of the things that he told

2    you and many of the things that he told you you're going to

3    hear during the course of this trial because I don't think

4    you are going to hear that.

5            Before I get into that, let me reintroduce

6    myself.  My name is Thomas Bayard.  And seated over there

7    is Steven Loizza.  And we represent what has been

8    collectively referred to as the Alessi defendants.

9            And despite efforts to make it seem more

10   confusing than it is, it really is simply two companies.

11   There is a company called the Alessi Trustee Corporation

12   that was an entity that did HOA collection work for a

13   number of years in Nevada, and then the Alessi & Koenig Law

14   Firm took over for what we call ATC for Alessi Trustee.

15           They are sequential.  In other words, the Alessi

16   Trustee Corporation was around for a number of years, and

17   the law firm took over and kind of ran with it, with the

18   processes from there.  It's really not that confusing.

19   There's kind of a line in the sand in 2008 when that

20   transition took place.  But you'll hear all about that.

21           And I think there -- you know, when the Court

22   started this morning, I thought it very refreshing that the

23   judge took time to give you, as at that point was a panel

24   of jurors, kind of historical context.

25           Remember the judge was talking about kind of how

1   we ended up here with our jury system and the breakaway

2   from old England.

3           And it's particularly relevant to this case

4   today because today's case is also rooted in history.  Back

5   in merry-old England, you remember the Court talked about

6   some of the crazy stuff that went on.  They used to have

7   something called debtor's prisons.

8           So what they would do -- if you ever read

9   Charles Dickens, they used to throw people in jail if you

10  couldn't pay their debt.  Now, it never made any sense to

11  me because if you're in jail, how are you going to make

12  money to pay your debt?  It was kind of crazy.  But that's

13  what they did.  And if you didn't have family members to

14  get you out, you just rotted there.

15          So when the calmness broke away, there are a lot

16  of things that are upset.  Taxation, as the Court

17  mentioned.  But the concept of debtor's prisons was

18  something else that they weren't that happy with.

19          So in that same Constitution that the judge

20  talked about, there's protection forwarded by bankruptcy so

21  that people don't have to go to debtor's prison.  They can

22  get a fresh start through the country's bankruptcy code.

23          But we've come a long way since then.  And I

24  think it was in about 1977 that the Congress said, You

25  know, there's a problem with debt collectors going crazy.

1            Everyone's probably heard stories about phone

2      calls to work, phone calls throughout the day, phone calls

3      at night, unnecessary threats, all of these things that

4      were going on that even though the debt may be legitimate,

5      the practice of collecting it wasn't always the case.

6            And so Congress passed something called the Fair

7      Debt Collection Practices Act.  And the purpose of the

8      statute is exactly like it sounds, to ensure fair debt

9      collection.

10            So in this case, one of the claims that

11      Ms. Ellis has brought, as indicated by Mr. Bourassa, was a

12      violation of this Fair Debt Collection Practices Act.  It

13      sounds really ominous.  It sounds like a very bad thing.

14      And it is.  Because laws are meant to be followed.  Rules

15      are meant to be followed.

16            But I think it's important to give you context

17      in terms of what are we talking about here because the

18      Court has already made some findings in this area.

19            One of the rules that the FDCPA put in place is

20      the rule that whenever you communicate with a debtor,

21      certain information must be in the communication, in the

22      letters.

23            In this case, the Court has made a determination

24      that one of the letters that was sent by the Alessi

25      defendants to Ms. Ellis didn't say in there that Alessi &

1    Koenig is a debt collector.  That's the violation, that the

2    letter forgot, for whatever reason, that -- to include that

3    language.  And that is a technical violation of the

4    statute.  I'm not sure it's a technical violation worth

5    half a million dollars, but that's what happened.

6            You will hear testimony today -- or, excuse me,

7    not today but probably tomorrow, from Mr. Alessi.  And

8    Mr. Alessi will testify that the mistake in not including

9    the language in the letters was not a result of some

10   nefarious scheme, was not a result of an effort to defraud

11   or mislead Ms. Ellis, it was simply a mistake.

12           Ms. Ellis will testify, and I imagine that she's

13   going to testify that she knew full well when she got that

14   letter that Alessi & Koenig was a debt collector.  You will

15   probably have an opportunity to see the letter in question.

16   You'll probably have an opportunity to see several letters

17   that were sent to Ms. Ellis.

18           And you will see that it is crystal clear from

19   each and every correspondence with Ms. Ellis that the

20   Alessi defendant involved -- was, in fact, a debt

21   collector, that a debt was being collected, that a claim

22   was being enforced against her property.

23           So while you may find -- or you will have to

24   find, because the Court has already determined there was a

25   technical violation, when it comes to the FDCPA claims, you

1    are not going to hear any evidence, you are not going to

2    see any documents, you're not going to hear any testimony

3    that would support a finding that anybody involved on the

4    defendant -- from the defendants, whether it's the Alessi

5    Trustee Corporation, whether it's Alessi & Koenig, had any

6    type of intent to commit any wrongful act to mislead, to

7    cause any confusion, or to cause any harm to Ms. Ellis.

8              And that's going to be very important.

9              And as Mr. Bourassa said, when Mr. Alessi takes

10   the stand, he's going to have to answer questions.  And

11   that's true.  And I ask that you listen very carefully to

12   those questions, you listen very carefully to the answers

13   Mr. Alessi provides.

14             At the end of the day, you will hear Mr. Alessi

15   testify about all of the procedures that were in place, all

16   of the efforts that the Alessi defendants take to follow

17   the law, to do it the right way.

18             At the end of the day, the evidence is going to

19   lead you to an inescapable conclusion that there is no

20   basis for awarding any sort of damages based on the

21   negative intent or the malicious intent or the nefarious

22   intent of any of the defendants in this case.

23             To the extent that mistakes were made, they were

24   just that, mistakes.

25             Ms. Ellis has also brought a claim for civil

1    racketeering.  And I'm glad that Al Capone is not around

2    anymore.  And Mr. Alessi certainly isn't Al Capone.

3              And to be frank with you, I'm not sure what

4    evidence you're going to hear on that claim.  Because I've

5    never understood what evidence the plaintiff has to support

6    a racketeering claim.

7              Mr. Bourassa mentioned an issue with payments.

8    And essentially what Mr. Bourassa and Ms. Ellis is going to

9    testify to is that she has a problem with the way that her

10   payments applied -- were applied in this case.

11             Now, remember, the first words that were out

12   of -- almost the first words that were out of Mark's mouth,

13   and certainly one of the first things that you're going to

14   hear from Ms. Ellis, because she can't avoid it, is that

15   she was, in fact, delinquent to her homeowners association.

16             We can put that issue aside.  This is not a case

17   where a rogue collection agency or rogue law firm was going

18   after somebody who didn't owe money.  The fact of the

19   matter is that, like a lot of people, Ms. Ellis faced

20   financial problems that left her unable to pay her bills,

21   it left her unable to pay her assessments.

22             You're going to hear testimony from the manager,

23   from the ArrowCreek Homeowners Association, who will

24   testify how that lack of payments -- when homeowners don't

25   pay their assessments, how it affects the association.

1          You're going to hear testimony that the

2     association has a collection policy in place, a copy of

3     which, each year, is provided to everybody in that

4     association, including Ms. Ellis.

5          You're going to hear testimony that collection

6     policy specifically says, If you fall delinquent in your

7     assessments, you are going to be placed in collections.  If

8     you are placed in collections, your account is going to be

9     charged for each and every one of the collection activities

10    that are made necessary by the fact that you fell

11    delinquent on your assessment payments.

12         You're going to hear testimony that a specific

13    fee schedule has been sent -- in fact, is sent every year

14    to every homeowner in the association, including Ms. Ellis,

15    that not only puts them on notice of what's going to happen

16    if they fall delinquent, it gives them a specific breakdown

17    of each and every charge they're going to be incurred --

18    that's going to be incurred if they fall delinquent, if

19    they are forced into collections.

20         You're going to hear testimony that Nevada law

21    and the associations governing documents, which are called

22    CC&Rs, both specifically provide that if you fail to pay

23    your homeowner's assessment that you will have a lien

24    placed against you on your property.

25         You will hear testimony that both Nevada law and

1      the CC&Rs specifically provide that if a lien is placed on

2      your property that you, as the delinquent homeowner, are

3      going to be responsible for paying the charges that are

4      associated with that lien.

5              You're going to hear testimony that both Nevada

6      law and the CC&Rs specifically state if you have a lien

7      placed on your property and you still don't pay it that

8      you're going to be placed into a collection process that

9      starts with a nice friendly letter and ends with you

10     potentially losing your home.  Serious, serious

11     consequences.

12             You're going to hear that Ms. Ellis was informed

13     of these consequences time and time and time and time

14     again.

15             You're going to hear testimony that she failed

16     to take steps to avoid these additional consequences from

17     happening.

18             You're going to hear testimony that says that if

19     when she got the -- what's called a notice of intent to

20     lien, which is a very friendly initial letter that says,

21     Hey, you're behind, that if she would have paid that the

22     whole process would have stopped.

23             You're going to hear testimony that she didn't

24     pay.  You're going to hear testimony that she got a lien

25     that, Okay, you ignored our first notice, here's the second

1    one, now we've got an actual lien your property, please

2    take care of it.  And the testimony is going to be that she

3    didn't pay that either.

4               You're going to hear testimony that after

5    that -- a month went by after she got the lien that she got

6    what's called a notice of default, which says in big bold

7    letters across it -- you're going to see a chance to see

8    the document -- Notice of Default and Election to Sale.  In

9    bold letters across the top it says, Warning, if you don't

10   pay this, bad things are going to happen.  We're going to

11   foreclose on you.  You're going to lose your property.

12              The test- -- the evidence is going to show --

13   the testimony is going to show that she didn't pay that

14   either.  The evidence is going to show that she then got

15   what's called a notice of sale on both of her properties

16   that says, Okay, you've ignored us up until now, so

17   pursuant to Nevada law, pursuant to the provisions of the

18   CC&Rs of your association, we're setting the property for

19   sale.

20              The evidence is going to show that she still

21   didn't pay, that instead she went and filed a lawsuit.  And

22   that's how -- and we ended up here today.

23              The evidence is going to show that, yes, over a

24   certain period of time from now back, a year or two, that

25   she has been making payments.  And I'm sure that

1    Mr. Bourassa will walk you through check after check after

2    check.

3            As you listen to the evidence, and as you look

4    at the various documents, it's important to keep in mind

5    that each and every thing that happened was a result of the

6    plaintiff's conduct.  You'll see documents.  You're going

7    to see ledgers that show that despite these payments, by

8    the time she started making payments she was so far behind

9    that simply paying her monthly assessments without dealing

10   with the delinquency wasn't enough.

11           You're going to hear testimony from Mr. Alessi

12   about that under Nevada law money that is incurred in the

13   collection process, money that is incurred because of your

14   failure to pay your assessments, collection fees and costs,

15   attorneys' fees and costs are all specifically treated

16   exactly the same as the original assessments from the

17   association.

18           You're going to hear testimony from Mr. Alessi

19   that there is a specific statute that says that, that says

20   that all collection fees and costs incurred enforcing that

21   assessment obligation are to be treated exactly like

22   assessments.

23           You will hear testimony that every single dollar

24   that Ms. Ellis paid was properly applied to her account.

25           You're going to see document after document,

1    ledger after ledger that shows exactly how each and every

2    payment she made was applied.  Some of the money went

3    towards the association's portion of the obligation, some

4    of the money went toward the collection entity's portion of

5    the obligation.  They were all applied to her account.  She

6    got credit for each and every dollar.

7              You may hear testimony, as Mr. Bourassa alluded

8    to, that as a result of these liens being placed on her

9    property, that she suffered damages in excess of a half a

10   million dollars, $500,000 plus.

11             You're not going to hear any corroboration of

12   that testimony.  You're not going to hear any expert

13   testimony saying that that's why her properties didn't

14   sell.  You may not hear any testimony that her properties

15   were ever on the market.

16             The reality is that the liens were placed on the

17   property because Ms. Ellis didn't pay her assessment

18   obligation.  The process that was followed is a process

19   that is set forth in the law.  And that's for each and

20   every step of the way.

21             If there's any -- and I don't believe that

22   there's going to be any evidence that shows that there was

23   any actual damages, as Mr. Bourassa used the term, that

24   flows from the fact that she wasn't told in one letter that

25   Alessi & Koenig was a debt collector or that because the

1     liens were placed on her property.

2               At the end of the day, the evidence is going to

3     be that -- like I said, that Ms. Ellis is responsible for

4     any ramification that flowed from the fact that she was in

5     the collection process is directly attributable to

6     Ms. Ellis' conduct.  Everything else is window dressing.

7               You will hear testimony possibly from Mr. Alessi

8     about this cease and desist order.  And Mr. Alessi will

9     definitely speak for himself.  But you'll hear testimony

10    that there was a mistake made by the Financial Institution

11    Division for the State of Nevada.  You will hear testimony

12    that they were sued in this very case because of that

13    mistake.

14              You will hear testimony that they admitted in

15    this very courtroom that they made a mistake.

16              And so ultimately the -- yes, that event did

17    occur, but it has ultimately no bearing on what Ms. Ellis

18    has gone through, it has no bearing on the facts and

19    circumstances involving Ms. Ellis or her properties.

20              So I was remiss and I didn't thank you guys for

21    being here at the beginning.  I really do appreciate it.

22    Everyone here on both sides, I think, understands that this

23    is not the world's sexiest issue.

24              We're dealing with collections, lots of numbers

25    and lots of math, lots and lots of ledgers and reports and

1    stuff like that.  And it's going to be hard at times to

2    stay focused and pay attention.  It's hard for us, I think,

3    sometimes and we live this stuff.

4            And so we very much appreciate your dedication,

5    your coming in here early in the morning, your having to

6    answer questions and now having to sit silent and listen to

7    the lawyers talk, the witnesses talk and stuff.  And so we

8    really do appreciate that.

9            In closing I just ask that you listen very

10   carefully to the evidence that's presented.  Listen very

11   carefully to the questions.  Listen very carefully to the

12   answers.

13           And before you guys are sent back into the jury

14   room to deliberate, we'll have an opportunity to talk to

15   you again and explain to you what -- what we think that it

16   all meant.  And we're not going to agree then, just like we

17   don't agree now.

18           But your job is going to be made so much easier

19   if you really do pay attention and listen to everything

20   that happens so when you go back in there, you'll be able

21   to have an informed discussion, once the judge gives you

22   permission to talk about the case, talk about the issues,

23   and reach a fair result.  That's all anybody can ask of

24   you.

25           And thank you very much.  I look forward, at the

1    end of the case, for the opportunity to talk to you again.

2    Thank you.

3            THE COURT:  All right.  That will take us to the

4    commencement of the evidence to be offered on behalf of

5    plaintiff.

6            Mr. Bourassa, do you have your first witness,

7    please.

8            MR. BOURASSA:  Yes, Your Honor.

9            Plaintiff calls Melinda James, also known as

10    Melinda Ellis.

11            COURTROOM ADMINISTRATOR:  Please raise your

12    right hand.

13            Do you solemnly swear that the testimony you

14    shall give in the cause now before the Court shall be the

15    truth, the whole truth, and nothing but the truth, so help

16    you God?

17            THE WITNESS:  I do.

18            COURTROOM ADMINISTRATOR:  Please be seated.

19            Please state your name and spell your last name

20    for the record.

21            THE WITNESS:  My legal name is Melinda James,

22    now, that's my maiden name.  But during this case I was

23    Melinda Ellis.  So M-e-l-i-n-d-a.  Last name Ellis,

24    E-l-l-i-s.

25            COURTROOM ADMINISTRATOR:  And can you please

1    tell us your city and state of residence.

2              THE WITNESS:  Reno, Nevada.  Washoe.  Thank you.

3              THE COURT:  All right.  Go ahead, please.

4              MR. BOURASSA:  Thank you, Your Honor.

5                        MELINDA ELLIS

6              called as a witness on behalf of the

7         Plaintiff, was examined and testified as follows:

8                       DIRECT EXAMINATION

9    BY MR. BOURASSA:

10   Q.    Ms. Ellis, since I've known you, you've always been

11   Ms. Ellis to me.  And I don't want to disrespect you by

12   calling you Ms. James and then Ms. Ellis and then Ms.

13   James.

14              So if it doesn't offend you, I'm going to call

15   you Ms. Ellis throughout.  That's what the caption says.

16   Is that okay with you?

17   A.    That's fine.

18   Q.    All right.  Ms. Ellis, we had the pleasure of

19   hearing a lot of details about the jury before we started.

20              Could you tell us a little bit about yourself.

21   Where do you live?

22   A.    I live in ArrowCreek, in Reno, Nevada.

23   Q.    What's the address of that property?

24   A.    1200 Broken Feather Court.

25   Q.    And how long have you lived there?

1    A.    I've lived there since 2000 at the address I'm at

2    right now.

3    Q.    Where did you live prior to that?

4    A.    Well, I moved to Reno in 1980.  I was originally

5    from Southern California.

6    Q.    Did you live -- how many community association

7    properties have you ever lived in in the Reno area?

8    A.    Well, in 1980, when I moved here with my husband, we

9    moved a business here, and we moved into Lakeridge Shores.

10   I built a house there in Lakeridge Shores.  And I lived

11   there for approximately 20 years, until 2000.

12   Q.    What facilitated you moving out of Lakeridge Shores?

13   A.    Because in 2000 I sold -- we sold our restaurant

14   manufacturing company.  And I decided that -- ArrowCreek

15   was a brand-new development, and so I decided to sell the

16   home I had -- we had built the home in Lakeridge Shores,

17   and I decided to sell it, move to ArrowCreek.  And I bought

18   a lot there that I was planning on eventually to build on.

19   And I bought a home to live in during that time.

20   Q.    With respect to Lakeridge Shores, is that a --

21   that's a homeowners association --

22   A.    Yes.

23   Q.    -- community association?

24         You're familiar with the rules from Lakeridge

25   Shores while you were there?

1    A.    Yes, absolutely.

2    Q.    Did you pay dues while you were there?

3    A.    Yes.

4    Q.    Would you explain to us how that worked at that

5    particular property?

6    A.    It was a monthly dues for the guard gate and for

7    snow removal or maintenance.  And it was a very pleasant --

8    it was a pleasant place to live.  Lakeridge Shores is very

9    nice.

10   Q.    Did you have monthly dues?

11   A.    Yes.

12   Q.    How did you pay those?

13   A.    Pardon?

14   Q.    How did you pay those?

15   A.    I'm sorry.  I have a cold, and so I'm not hearing

16   very well.

17   Q.    I can speak up.

18   A.    If you could speak up a little.  My head is

19   congested.

20   Q.    Sure.  I'll rephrase it.

21         How did you pay your dues at the Lakeridge

22   Shores HOA?

23   A.    Monthly, on a monthly basis.

24   Q.    Did you have an automatic withdrawal or a check?

25   A.    No, I mailed it, the check, in every month.

1    Q.    Was that a surprise to you that ArrowCreek has

2    similar HOA dues?

3    A.    No.  No.  Not at all.  I moved there because I

4    liked, you know, an environment where there's a guard gate

5    and there's CC&Rs.

6    Q.    You had mentioned in the previous comments that you

7    had sold a company.  Could you explain to us what that

8    company was.

9    A.    Yes.  My husband's father started -- it's called

10   Toppo Manufacturing.  And he started it in 1957.  And it

11   originated the liquor pour spout on top of all the bottles,

12   and then the condiment dispenser where the cherries and

13   lemons -- like on Cheers, you would see the condiment

14   dispenser right there.

15              And the speed racks where the bottles are, order

16   wheels, paging systems, like 1 through 10 the light would

17   come on and, you know, to pick up here.  The waitress would

18   know to pick up her food.

19              There's about 300 different products, but

20   they're all small wares.

21              And so in 1980 we moved it up here because

22   Nevada's just a great place to live and for a manufacturing

23   company.

24              And then in 2000 I sold the Toppo -- I sold

25   Toppo but kept the paging part of the company.  So to this

1    day I do the -- like the round coasters when you're waiting

2    for your table or the waitresses page the chef -- the chef

3    pages the waitress and they have a pager on their belt

4    clip.

5              And the number panels, like 1 through 10 or 20,

6    like Denny's and stuff will have it.  And Burger King is

7    probably my biggest customer.  I sell stock level light

8    systems to the Burger Kings all over the world.

9    Q.    When you say you make the pagers or you do the

10   pagers, what do you mean by that?

11   A.    The pagers I buy in resale.  But I manufacture the

12   number panels, the 1 through 10 or 20, that type of --

13   number panels, that type of stuff.

14   Q.    Who does the work?

15   A.    Pardon?

16   Q.    Who does the work?

17   A.    Well, when I sold it in 2000, I sold -- there's a

18   25-square-foot building.  It was large, and we sold all the

19   equipment.  So the -- it's just small now.  But I have some

20   people that work for me that build it.  Now the company's

21   small after that.

22   Q.    How many employees do you have?

23   A.    Just two and myself.  Small.

24   Q.    Who does your books?

25   A.    I do.

1    Q.    How long have you been doing that?

2    A.    Well, I started with Toppo when I was 20.  I met my

3    husband when I was only 18.  And I was right into Toppo

4    Manufacturing because his father passed away very early on.

5          My husband is a mechanical engineer, was going

6    to go to Detroit to build cars, design cars.  That's the

7    love of his life.  But his dad died, so his mother asked

8    him if he would come into Toppo Manufacturing and help him.

9          And then shortly after that his mother died.

10   And so I have -- was there, you know, since I was 20.  And

11   we grew the company -- it was very small at that time, but

12   we grew the company together.  And then we sold it in 2000.

13   Q.    That's the same time you purchased the ArrowCreek

14   property.

15   A.    Correct.

16   Q.    Was there a relation with that?

17   A.    Yes.

18   Q.    You just happened to have the money on hand?

19   A.    Well, I sold -- I sold my house in Lakeridge Shores

20   that we had built, and then I also sold the Toppo

21   Manufacturing.  And I took that cash and put it into a

22   house where I live right now in ArrowCreek and into the lot

23   in ArrowCreek.

24   Q.    Now, financially speaking, it looks like you were

25   pretty regular at paying your HOA dues at ArrowCreek for

1    quite sometime, from 2000 --

2            MR. BAYARD:  Objection, Your Honor.  Lacks

3    foundation.

4            MR. BOURASSA:  I'll rephrase it, Your Honor.

5            THE COURT:  Sustained.

6            Rephrase, please.

7            MR. BOURASSA:  Sure.

8    BY MR. BOURASSA:

9    Q.   After you bought the property at ArrowCreek, did you

10   pay your HOA dues?

11   A.   I used to pay a year at a time on both of them.  So

12   it was -- it was only like 125 a month or so, so -- maybe

13   it was less than that.  But I used to pay -- it was about

14   2,000 a year, so I just paid the whole thing at a year at a

15   time so I didn't have to write checks every month.

16   Q.   And financially what happened?

17   A.   Well, in 2007, it was approximately then, the

18   economy -- that's when the banks failed, the economy

19   started.  It really affected the restaurant industry.

20           When there's a shortage of money, the one thing

21   they don't really need is a paging system, they'll just

22   yell to the chef and the waitress.  And so the -- it really

23   hit the economy and -- for me.

24           And I was married at the time to my husband who

25   is a structural engineer.  And that's the Ellis.  And he

1   also -- he had a big company here for 35 years, about 15

2   employees.  And his business just all of a sudden, within a

3   month, there was no structural -- you know, nobody was

4   building.

5           So both of our businesses got hit at the same

6   time, and we were -- you know, we were without cash and

7   really struggling.

8   Q.   So how did that impact you with respect to paying

9   your bills?

10  A.   It was tough.  It was tough.

11  Q.   What did you do to manage that?

12  A.   Pardon?

13  Q.   What did you do to manage that?  How did you cope

14  with the hard times?

15  A.   Well, he let go of all -- everybody that worked for

16  him, started trying to find work in California.  Has since

17  stayed in California.  Because -- I mean, he was -- he

18  built the Nugget, the Peppermill, did the whole retrofit on

19  the Capitol building.  He was very successful here.  And

20  within, I mean, a month, just a couple months, there was

21  absolutely no work for a structural engineer.

22          And for myself, I just let people go.  And we

23  just, you know, really cut back.  But it was a very tough

24  time.  Still -- we're still trying to get out of it.  Still

25  not -- still not great.

1    Q.    So at what point -- I'm sorry.  Strike that.  At

2    some point you stopped paying bills.  What bills did you

3    stop paying?

4    A.    Well, the HOAs I got -- I stopped paying those.  I

5    got behind because I was trying to pay the mortgage and the

6    power bills and the utility and everything else, and I did

7    get behind on the HOAs.

8    Q.    What happened as a result of that?

9    A.    Well, they sent me a notice, you know, that you're

10   behind.  ATC did.  Alessi Trustee Corporation sent me a

11   notice.

12   Q.    And what did you do about that?

13   A.    Well, it -- I got a couple notices.  And I started

14   trying to contact them.  And this went on for quite a few

15   months.

16         When I finally got ahold of Alessi himself, it

17   was -- we had a phone conversation.  I said, I need an

18   accounting to find out, you know, exactly what and how much

19   I owe, what are the attorneys' fees, what are the -- I knew

20   approximately how much I owed at the time was approximately

21   2,000 on each lot, without their fees.  So it was around

22   $4,000 without their attorneys' fees or without the

23   additional charges that they added.

24   Q.    And so what did you -- I'm sorry.  What did Alessi

25   do next, to your knowledge?

74

1    A.    Well --

2         MR. BAYARD:  Objection.  Vague, Your Honor.  For

3    both David Alessi as an individual and the Alessi Trustee

4    Corporation.

5         MR. BOURASSA:  Rephrase that again, Your Honor.

6         THE COURT:  Go ahead.

7    BY MR. BOURASSA:

8    Q.    What did Alessi Trustee Corporation do next?

9    A.    Well, finally, after numerous, numerous calls, they

10   sent me -- they -- we got a payment plan.  They sent me a

11   payment plan.

12   Q.    Did Alessi Trustee Corporation ever put a lien on

13   your property?

14   A.    Yes, back in -- it started June 14th, 2007, is the

15   first lien that they put on my lot and on my house as

16   Alessi Trustee Corporation.

17   Q.    Sure.

18         Mr. Blackburn, would you show her Exhibit 7,

19   please.

20         Is that on the screen in front of you?

21   A.    Yes.

22   Q.    Can you see it as a whole document?

23   A.    Does it slide?

24   Q.    He takes care of that.

25   A.    Oh, there we go.  Now I see --

1    Q.    Mr. Blackburn, like I said, does all the magic with

2    the computers.

3    A.    Okay.  Now it's a whole document.

4    Q.    Do you see that document?

5    A.    Yes.

6    Q.    Do you see the date on that document?

7    A.    Yes.

8    Q.    Are you familiar with that document?

9    A.    Yes.

10   Q.    What is it?

11   A.    Okay.  So -- yeah, this is the first -- let me just

12   see which property.  Can you make it bigger?  Thank you.

13   Okay.  Now I can see it.  Yeah, for the 1200 Broken --

14   thank you.

15          This is for my home that I live at on 1200

16   Broken Feather Court.

17          MR. BOURASSA:  Your Honor, we would ask that

18   Plaintiff's Exhibit 7 be admitted.

19          MR. BAYARD:  No objection, Your Honor.

20          THE COURT:  It's admitted.

21          MR. BOURASSA:  Can you show the whole document,

22   Mr. Blackburn, please?

23   BY MR. BOURASSA:

24   Q.    So on this document, I think in the middle of the

25   screen, it says the 1200 Broken Feather.  That's your

1    property; is that right?

2    A.    Correct.  That's where my home is.

3    Q.    Oh, so that's your -- that's the one with your

4    residence on it?

5    A.    Yes.

6    Q.    And are you the only owner of record for that

7    property?

8    A.    Yes.

9    Q.    And that was in effect also in 2007?  You were the

10   only owner in 2007?

11   A.    Yes.

12   Q.    And you're the only owner today?

13   A.    Correct.

14   Q.    Okay.  All right.  And then down at the bottom there

15   is a couple of numbers in that last paragraph.  Do you see

16   the $1,962.58?

17   A.    Can you make it a little larger?  Thank you.

18        Yes, I do.

19   Q.    Do you know how that number was generated?

20   A.    No.

21   Q.    And then you see the sentence after that indicating

22   the $345 in collection or attorneys' fees and $50

23   representing collection costs, late fees, service charges

24   and interest?  Do you see that sentence?

25   A.    Yes.

1    Q.    Do you know what the $50 was used for?

2    A.    No.

3    Q.    You don't know what you're being charged for for

4    that?

5    A.    Well, I guess attorneys' fees and $50 represent

6    collection costs.  Attorneys' fees and 50 represent

7    collection costs -- I guess service charges and interest.

8    Q.    Did you ever ask Alessi Trustee Corporation for an

9    accounting of this amount?

10   A.    Yeah.

11   Q.    How it was broken down?

12   A.    Yes.  Yes.  Over and over.

13   Q.    And did they ever provide that to you?

14   A.    No.  Not -- no.  I finally got that payment plan

15   that I would make payments every month.  But I never got a

16   breakdown of exactly the amount and what I totally owed.

17          But I know for myself that the amounts that I

18   didn't pay were around 2,000 for the lot, around 2,000 for

19   the house, without their collection, attorneys' fees, or

20   interest.

21          MR. BOURASSA:  All right.  Let's take that off

22   the screen, please.

23          Could you please show Ms. Ellis the next page of

24   Exhibit 7.

25

1   BY MR. BOURASSA:

2   Q.    In 2007, Ms. Ellis, do you recall approximately how

3   much your monthly homeowners association dues were?

4   A.    I don't remember exactly.

5   Q.    Was it --

6   A.    125 maybe.  165.  I'm not quite sure back then.

7   Q.    Less than 200?

8   A.    Yes, definitely.

9   Q.    All right.  There's another document on the screen.

10  It's the second page of Exhibit 7.

11          Do you recognize that document?

12  A.    Yes.

13  Q.    And do you see down at the bottom the 00053?  Do you

14  see that number?

15  A.    Yes, I do.

16  Q.    Just so you know, that's the number that we stamped

17  on the page when we produce it to Alessi.  So this is a

18  document you gave to me.

19  A.    Okay.

20  Q.    But you do recognize that document?

21  A.    Yes.

22          MR. BOURASSA:  Your Honor, we would like to

23  admit the second page of that document as just Exhibit 7 as

24  well.

25          MR. BAYARD:  No objection, Your Honor.

1          THE COURT:  Pardon?

2          MR. BAYARD:  No objection, Your Honor.

3          THE COURT:  It's admitted.

4          So, Madam Clerk, is this all Exhibit 7 or two

5    pages?

6          COURTROOM ADMINISTRATOR:  Well, I need

7    clarification from counsel.

8          MR. BOURASSA:  Yeah, I'd prefer to admit it all

9    as Exhibit 7.  It occurred to me as I was turning the page

10   that it wasn't separated.

11         THE COURT:  We'll treat it all as Exhibit 7.

12   But be cautious about this in the future.

13         MR. BOURASSA:  I just didn't want to put the

14   cart out there and then get it run over by a bus.

15         COURTROOM ADMINISTRATOR:  So is the entire

16   document entered?

17         THE COURT:  Yes.

18         COURTROOM ADMINISTRATOR:  Okay.

19      (Plaintiff's Exhibit No. 7 received into

20         evidence.)

21         MR. BOURASSA:  Just in terms of housekeeping.

22   Thank you, Your Honor.

23         COURTROOM ADMINISTRATOR:  Thank you.

24         MR. BOURASSA:  All right.  Could we go ahead and

25   expand that.  And can you scroll all the way to the bottom.

1    BY MR. BOURASSA:

2    Q.    Do you see the date on this particular document?

3    A.    Yes, I do.

4    Q.    What's the date above the signature line there?

5    A.    July 9th, 2007.

6    Q.    Okay.  And if we scroll back up, the property

7    address, I think you can see on that document.

8              You went a little too far there, Mr. Blackburn.

9    A.    Yes, the 1200 Broken Feather.

10   Q.    That's the same property that we were talking about

11   immediately preceding, the page we were looking at before,

12   right?

13   A.    Right.

14   Q.    That's still your primary residence?

15   A.    Yes, that's where my home is.

16   Q.    All right.  And if we scroll up just a little bit

17   more, do you see the amount due on this particular

18   document?

19   A.    Amount due is $3,000.63.

20   Q.    Now, let's back out of this page, and let's put it

21   side by side with the first page of Exhibit 7.

22             Now, with respect to the 3,000.63 on page 2, did

23   you ask Alessi for an accounting of that?

24   A.    Yes.

25   Q.    Did they provide one to you?

1    A.    No.

2    Q.    And then the date of the two documents -- on the

3    first page it looks like it's June 1, 2007?

4    A.    Correct.

5    Q.    And the second page is July 9, 2007?

6    A.    Correct.

7    Q.    Did you pay your homeowners association dues for the

8    month of June in 2007?

9    A.    No, I don't think so.  I think that's when I was

10   late.

11   Q.    So it would be fair -- we'd agree that you probably

12   would owe another 125 or $150, maybe a late fee for that,

13   right?

14   A.    Yeah.  It was about 125 back then, I think.

15   Q.    Do you have any understanding of what the difference

16   is for the additional $800 in charges between June 1 and

17   July 9?

18   A.    No, I don't.

19   Q.    Did Alessi ever provide that to you?

20   A.    No.  Absolutely not.

21   Q.    And just so you understand it, I'm going through one

22   property at a time.  I don't want to confuse this more than

23   it has to.  So we're just going to talk about the Broken

24   Feather property first, and then we'll talk about the

25   second property.

82

1    A.    Okay.

2    Q.    All right.  Could we show the witness Exhibit 5,

3    please, Plaintiff's Exhibit 5.

4          Do you see that document?

5    A.    Yes, I do.

6    Q.    With respect to these documents, do you have an

7    understanding what it means when the stamp is up in the top

8    right-hand corner?

9    A.    Yes.  It's recorded on my property.

10   Q.    What does that mean to you?

11   A.    It's a lien.

12   Q.    All right.  So looking at this document, do you

13   recognize it?

14   A.    Yes.

15   Q.    Okay.  How do you recognize it?

16   A.    Because I've seen it before.

17   Q.    It was provided to you in conjunction with your

18   ownership of the property?

19   A.    Yes.

20        MR. BOURASSA:  Your Honor, we would ask that --

21   well, there's a second page, but it doesn't seem to really

22   matter.  We'd ask that that be admitted, Exhibit 5.

23        THE COURT:  Are you offering both pages or just

24   the one?

25        MR. BOURASSA:  Both pages, Your Honor.  If you

1   would like to take a look at the second page, I'd certainly

2   be happy to go through that with her.

3                THE COURT:  Please do.

4                MR. BOURASSA:  It's the notary page.

5                THE COURT:  All right.

6                Any objection?

7                MR. BAYARD:  No, Your Honor.

8                THE COURT:  It's admitted, both pages.

9                MR. BOURASSA:  Thank you, Your Honor.

10           (Plaintiff's Exhibit 5 received into

11           evidence.)

12   BY MR. BOURASSA:

13   Q.    Now, do you see the date of Exhibit 5 down at the

14   bottom?

15   A.    Yes, February 3rd, 2008.

16   Q.    Okay.

17   A.    Is that 2008?  Yeah.  Yes.

18   Q.    And let's see.  This applies -- like it says -- he's

19   already got it blown up right there -- applies to the lien

20   dated 6/14/2007.

21           That's the date you mentioned, correct?

22   A.    Yes.

23   Q.    And that was Exhibit 7, the first page.

24           Now, how much is due on this particular lien

25   document?

84

1    A.    Now it's $4,409.39.

2    Q.    Did you ask Alessi for an accounting of how they

3    came up with that number?

4    A.    Yes, I did.

5    Q.    Did they provide you with one?

6    A.    No, not at all.

7    Q.    All right.  Let's take that off the screen.  And

8    we'll pull up Exhibit 9.

9          Now, with respect to Exhibit 9, do you recognize

10   that document?

11   A.    Yes.

12   Q.    How do you recognize that document?

13   A.    It's a letter that they sent to me.  I can't see the

14   date.  Can you make it a little larger?  Thank you.  April

15   16th, 2008.  Okay.

16   Q.    Okay.  Do you see the phrase at the top, A Division

17   of the Law Offices of Alessi & Koenig?

18   A.    Yes, I do.

19   Q.    And then the date on this particular document there

20   in the matrix caption?  What date's this --

21   A.    April 16th, 2008.

22   Q.    All right.  Let's scroll down.

23          If you go ahead and take a look at this

24   document, do you see the total amount due down there at the

25   bottom?

85

1    A.    Yes, I do.

2    Q.    And how much is that?

3    A.    $8,948.33.

4    Q.    Now, you just became delinquent on this in 2007; is

5    that right?

6    A.    Correct.

7    Q.    And your homeowners association dues were, what, 125

8    a month, plus or minus, call it --

9    A.    Right.

10   Q.    -- 150 to be safe?

11         Can you tell me approximately how many months

12   you would estimate that you were behind in homeowners

13   association dues on the 1200 Broken Feather Court property

14   as of October 30, 2008?

15   A.    I'm not sure exactly.  Well, it would have been June

16   2007 to October of 2008.

17         MR. BOURASSA:  While you're working on that,

18   Your Honor, we would just move to admit this document.

19         THE COURT:  Any objection?

20         MR. BAYARD:  None, Your Honor.  Are we admitting

21   both pages?

22         THE COURT:  It's admitted.

23         MR. BOURASSA:  Yes.  The second page is just a

24   signature block.

25         THE COURT:  It's admitted as to both pages.

1              (Plaintiff's Exhibit 9 received into

2          evidence.)

3              MR. BOURASSA:   Thank you, Your Honor.

4              So go back to that first page, Mr. Blackburn.

5     BY MR. BOURASSA:

6     Q.    So I'm looking at the bottom of this letter, and I

7     see $239.24 as the calculation Alessi has for your monthly

8     assessment as of October 30, 2008.

9              Do you see that?

10    A.    Yeah.  That would have to be both the house and the

11    lot.

12    Q.    So they're combining two bills on one here?

13    A.    Yes.

14    Q.    That's not what the letter says, though, is it?

15    A.    No, it doesn't.  But it has to be both.

16    Q.    I just did the real easy math.  It doesn't come out

17    even.  It looks like line 4 there, Assessments Through

18    October 30 -- actually, do you have an understanding of why

19    the letter is dated April 18, 2008, and they're charging

20    you for assessments through October 30, 2008?

21    A.    Yeah, they're adding six additional months.  They

22    want me to pay ahead of time for six more months.

23    Q.    Why is that?

24    A.    I don't know.  But the association dues now are only

25    220 a month per lot.  So they were around a hundred back

1    then.  That's what they are now per lot.

2    Q.    So does this letter accurately --

3    A.    Seven years ago.

4    Q.    Sorry.  Does this letter accurately reflect what you

5    owed on the 1200 Broken Feather Court property as of April

6    18, 2008?

7    A.    No, not at all.

8    Q.    Does it accurately reflect the assessments due even

9    through October 30, 2008?

10   A.    No.

11   Q.    If you scroll up and you look at those charges, the

12   notice of intent to lien, notice of default, do you have an

13   understanding what those charges reflect or relate to?

14   A.    They're -- just what they're saying.  I mean,

15   attorneys' fees.  They're charges to lien the property.

16   Q.    Okay.

17   A.    Payment plan letter.

18   Q.    So your testimony that this letter is inaccurate

19   with respect to the amounts that you owed at that point in

20   time on that property?

21   A.    Definitely.

22   Q.    All right.  Let's look at Exhibit 9, please.

23   Actually, I'm sorry.  Strike that.  Let's go back and stay

24   with Exhibit -- what was that?  That was Exhibit 9.  I'm

25   sorry.

1              When you look at this letter, does it have the

2      statement that states that Alessi Trustee Corporation is a

3      debt collector?

4      A.    No, it does not.

5      Q.    Does it have a statement that Alessi Trustee

6      Corporation, in sending you the letter, is attempting to

7      collect the debt?

8      A.    No, it does not.

9      Q.    Does it have a statement that any information

10     obtained by Alessi Trustee Corporation will be used for the

11     purpose of debt collector?

12     A.    No, it does not.

13     Q.    Does it instruct you in any manner on how you should

14     dispute the charges that are contained within this

15     document?

16     A.    No, it does not.

17     Q.    Would it be fair to say that this is asking for at

18     least twice what you think you owe at that point in time?

19     A.    Yes.  More than twice.  Three times.  Yeah.

20     Q.    Let's look at Exhibit 3.

21              MR. BAYARD:  I'm sorry, which exhibit?

22              MR. BOURASSA:  Exhibit 3.  I'm going

23     chronologically just so -- I'm doing the best I can with

24     what I've got here.

25

1    BY MR. BOURASSA:

2    Q.    All right.  Have you seen Exhibit 3 before?

3    A.    Yes.

4    Q.    What is Exhibit 3, in your understanding?

5    A.    Just a minute.  I've got two on my screen.

6    Q.    They're the same page.  Exhibit 3 is going to be

7    three pages long.

8    A.    Oh, it's a couple pages?  Okay.  Okay.

9          So is this -- which address is this?  Okay.  So

10   this is my lot at Flowering Sage.

11   Q.    Oh, you know what, I'm sorry.  I've got up the wrong

12   column.  We'll come back to that one.

13         Let's look at Exhibit 12, please.

14         Do you recognize Exhibit 12?

15   A.    Yes.

16   Q.    And which property is that exhibit related to?

17   A.    The 1200 Broken Feather Court.

18   Q.    And you're familiar with this because you've seen

19   it?

20   A.    Yes, correct.

21   Q.    The exhibit that we have is two pages, but they're

22   identical.  So just move to admit the first page of that

23   exhibit as --

24         THE COURT:  Mr. Bayard?

25         MR. BOURASSA:  -- Exhibit 12.

90

```
 1              MR. BAYARD:  No objection, Your Honor.
 2              THE COURT:  It's admitted.
 3          (Plaintiff's Exhibit 12, page 1 received into
 4          evidence.)
 5   BY MR. BOURASSA:
 6    Q.   So what's the date on this document, up at the top,
 7   Exhibit 12?
 8    A.   May 23rd, 2008, I think.  Did I see that?  Yeah.
 9   2008.
10    Q.   And on this particular document, what is the amount
11   due?
12    A.   I have to go -- scroll up a little.
13              MR. BOURASSA:  Mr. Blackburn, if you would
14   scroll all the way to the bottom, please.
15              THE WITNESS:  I can't see the bottom of it.
16   $6,472.27.
17   BY MR. BOURASSA:
18    Q.   And it says there's a payment received here.  Do you
19   see how much that is?
20    A.   Yes.
21    Q.   How much is the payment?
22    A.   $1,491.39.
23    Q.   Is that a payment you made?
24    A.   Yes.
25    Q.   I think we'll be talking a little bit more about
```

```
1    that payment as we get further along.
2              But so as of May 23rd, 2008, you were attempting
3    to make payments on these accounts?
4    A.    Correct.  By their payment plan.
5    Q.    All right.  Let's look at -- oh, I'm sorry, this
6    whole FDCPA thing.
7              Does this particular letter, in your reading it,
8    have any statements regarding that this letter is an
9    attempt to collect a debt?
10   A.    No, it does not.
11   Q.    Does this letter have any statements with respect to
12   whether or not this is a communication from a debt
13   collector?
14   A.    No, it does not.
15   Q.    Does this letter have any statements with respect to
16   any information Alessi Trustee Corporation may receive will
17   be used for the purposes of collecting a debt?
18   A.    No, it does not.
19   Q.    Despite the application of your $1,491.39 payment on
20   this file -- on this particular letter, does this letter
21   accurately reflect the amount of past due homeowner
22   association dues that you had or owed, in your estimation,
23   as of May 23rd, 2008, the date of the letter?
24   A.    No, it does --
25              MR. BAYARD:  Objection.  Lacks foundation.
```

1           THE WITNESS:  No, it does not.

2           THE COURT:  Wait.  We have an objection.  I'm

3   going to overrule it.  I think the question was

4   sufficiently clear.

5   BY MR. BOURASSA:

6   Q.    Just to be clear, you don't believe that this letter

7   accurately reflects the amount of past due association dues

8   for the 1200 Broken Feather property; is that right?

9   A.    No, it does -- it's not accurate.  That amount is

10  not accurate.

11  Q.    Too high or too low?

12  A.    Too high.

13  Q.    Why do you say that?

14  A.    Because at the time -- well, you don't have the

15  payment plan.  But I owed approximately $4,000, $2,000 on

16  each one, of which I made payments.

17          I might be jumping ahead of myself, so --

18  Q.    But that's the basis for your belief that this is

19  not accurate with respect to 1200 --

20  A.    Correct.

21  Q.    -- Broken Feather?

22  A.    It's not accurate.

23          MR. BOURASSA:  Your Honor, I don't know if now

24  would be an appropriate time for our afternoon break.

25          THE COURT:  I'll take the clue.  Let's take an

1    afternoon break at this time.

2            Ladies and gentlemen, we'll break for 15

3    minutes.  I notice that clock's a little bit fast.  But by

4    that clock we'll reconvene at 3:15, or when everyone is

5    ready.

6            I want to caution you, of course, not to discuss

7    the case in any way or permit anyone to discuss it in your

8    presence.

9            And we'll take our break.  You may go ahead and

10   step down.

11       (Recess from 2:57 p.m. until 3:20 p.m.)

12       (Outside the presence of the jury.)

13           THE COURT:  Let's bring the jury in, please.

14           COURTROOM ADMINISTRATOR:  Yes, Your Honor.

15       (Jurors enter courtroom at 3:20 p.m.)

16           THE COURT:  Have a seat, please.

17           The record will show that we are reconvened in

18   open court.  The jury is all present, as are counsel and

19   the parties.

20           Go ahead, please, with your examination of

21   Ms. Ellis.

22           MR. BOURASSA:  Thank you, Your Honor.

23           Mr. Blackburn, could you please show Ms. Ellis

24   Exhibit 10.

25

1    BY MR. BOURASSA:

2    Q.    Ms. Ellis, are you familiar with this document?

3    A.    Yes, I am.

4    Q.    What is it?

5    A.    This is -- let me look at this just a second, make

6    sure this is the one I'm thinking.

7              Yeah, this is the payment plan that the Alessi

8    Trustee set up for me.

9    Q.    Okay.

10             MR. BOURASSA:  Let's go ahead and move that

11   Exhibit 10 into evidence, please.

12             THE COURT:  Any objection?

13             MR. BAYARD:  No objection, Your Honor.

14             THE COURT:  It's admitted.

15        (Plaintiff's Exhibit 10 received into

16        evidence.)

17             MR. BOURASSA:  Thank you, Your Honor.

18   BY MR. BOURASSA:

19   Q.    Could you explain to me how you came to try to reach

20   a payment plan with the Alessi Trustee Corporation?

21   A.    Well, I sent them numerous letters asking them to

22   please give me an accounting, an accurate accounting of

23   what I owe and what are the fees, attorneys' fees and

24   everything.

25             I never received that from them.  But I did

1    finally get this payment plan.  And they came up with this

2    number.

3    Q.    So they proposed this payment plan to you, without

4    providing you any of the backup?

5    A.    Yes, correct.

6    Q.    Did you have an understanding of what would happen

7    if you did not agree to that payment plan or make those

8    payments?

9    A.    Yeah, they would sell my house and my lot.

10   Q.    Okay.  And I notice the first payment on the payment

11   plan is $1,491.39; is that right?

12   A.    Yes.

13   Q.    And I believe we just finished talking about Exhibit

14   12, where you made a payment of $1,491.39.  Do you recall

15   that?

16   A.    Yes.

17   Q.    So you were abiding by the payment plan at that

18   time?

19   A.    Yes.

20   Q.    Then what happened?

21   A.    Well, I made a payment on -- do you have a copy of

22   the check?

23   Q.    Sure.

24   A.    The date, exact date?

25   Q.    Let's go ahead and put up on the screen the first

1    check.

2            Do you have that on your screen?

3    A.    Yes.

4    Q.    Can you tell me what you're seeing on your screen?

5    A.    Okay.  There we go.  Yeah.

6            So the first payment was due on May 30th --

7    Q.    Just a second.  I want to make sure the jury can see

8    it.  So this is your check, right?

9    A.    Correct.

10           COURTROOM ADMINISTRATOR:  The jury can't see it.

11           MR. BOURASSA:  Right.  That's why I'm stopping

12   her, getting the thing authenticated.

13           We'd move to admit this copy of the check dated

14   May 13, 2008, as Exhibit 56.

15           THE COURT:  Exhibit what?

16           MR. BOURASSA:  56, Judge.

17           THE COURT:  All right.

18           Any objection?

19           MR. BAYARD:  I don't have a copy of this actual

20   exhibit, Your Honor.  But it appears to be what it purports

21   to be.

22           THE COURT:  All right.  I'll admit it and

23   reserve any right to raise a later objection.

24           MR. BOURASSA:  Thank you, Your Honor.

25

```
 1              (Plaintiff's Exhibit 56 received into

 2          evidence.)

 3              MR. BOURASSA:  So that's not shown to the jury,

 4      Ms. Clerk?

 5              THE COURT:  Yes.

 6              COURTROOM ADMINISTRATOR:  Yes.

 7              MR. BOURASSA:  Thank you.

 8      BY MR. BOURASSA:

 9      Q.    So could you explain to me -- you've got some

10      specifications on this check down at the bottom with the

11      description.  The 1200 Broken Feather --

12      A.    Yes, this payment is just for my home, 1200 Broken

13      Feather Court, lot 210.

14      Q.    Was it your practice to designate the payment for

15      your HOA dues, or whatever payment you were making, to one

16      house or the other or both?

17      A.    Yes.  I would always put it on the check and send in

18      the coupons that go with the payment to show where the

19      payment's going to.

20      Q.    Okay.

21      A.    Since I have two properties, a lot and a house.

22      Q.    Why did you do that?

23      A.    So that the accounting would stay clear.

24      Q.    All right.  So you made this payment.

25              We have now the shot of the back of that check.
```

1    I'm sorry.  Take that down, please.  Go ahead and give me

2    the next screen.

3            All right.  There's a document on the back of

4    your check.  Do you see what that says?

5    A.   Yes.  That was --

6    Q.   All right.  What -- can you tell me what's on your

7    screen?

8    A.   They received the check, and Alessi Trustee

9    Corporation cashed it and put in it their bank, Wells Fargo

10   Bank.

11   Q.   Okay.

12           MR. BOURASSA:  I would go ahead and move to

13   admit this as the next exhibit.  It would be 57.

14           MR. BAYARD:  No objection, Your Honor, subject

15   to the same fact that we don't have -- defense does not

16   have a copy of this document.

17           THE COURT:  Okay.  It's admitted.  And the same

18   reservation is provided.

19           MR. BOURASSA:  Thank you.

20           (Plaintiff's Exhibit 57 received into

21           evidence.)

22           MR. BOURASSA:  Could you put 56 and 57 up

23   together, please.

24   BY MR. BOURASSA:

25   Q.   Do you agree that's the front and back of the same

1   check --

2   A.    Yes.

3   Q.    -- Ms. Ellis?

4         Your check is payable to ArrowCreek Homeowners

5   Association, right?

6   A.    Correct.

7   Q.    And then you made a comment about it being deposited

8   by Alessi Trustee Corporation?

9   A.    Yes.  There's a letter that went with this check

10  that --

11  Q.    We're going to get --

12  A.    -- when I hand-delivered it to ArrowCreek it

13  stated --

14  Q.    We're going --

15  A.    -- what the check was for.

16  Q.    We're going to get to that next.  So let's go ahead

17  and show you that letter.  Show the letter in full, please.

18        And do you see that letter on your screen?

19  A.    Yes.

20  Q.    Is that the letter that you're referring to that

21  accompanied that check?

22  A.    Correct.  And they received -- I hand-delivered it

23  to ArrowCreek -- I'm sorry, Associated Management.  And

24  they stamped it on May 13th, 2008, they received that --

25  Q.    Slow down.  Slow down.

1    A.    Yeah.

2    Q.    Let's go ahead and get it in front of the jury.

3    A.    Okay.  Sorry.

4    Q.    They'd like to see the pictures, too.

5    A.    Sorry.  I'm just reading the screen.

6    Q.    So this is a letter that you sent with a copy of the

7    check.

8              MR. BOURASSA:  Your Honor, we would move that in

9    as Exhibit 58.

10             MR. BAYARD:  No objection, Your Honor.

11             THE COURT:  It's admitted.

12        (Plaintiff's Exhibit 58 received into

13        evidence.)

14   BY MR. BOURASSA:

15   Q.    All right.  Now, explain to me what was going on,

16   why are you hand-delivering this correspondence to the

17   management company?

18   A.    Because the first payment, per the payment schedule,

19   is due on the 30th of May, or they would sell the house.

20             So I made this payment, I think it's 17 days

21   ahead of time.  I have to get my math right.  But I made it

22   on May 13th, hand-delivered it to them, so they have their

23   first payment.

24   Q.    Okay.  So at that time did you think you had a

25   payment arrangement in place with Alessi Trustee

1   Corporation?

2   A.    Yes.  I did not agree with their payment schedule,

3   because the amounts were more than I owed, but I -- so

4   that's why I put it's disputed.  But I didn't want to lose

5   my house, so I started making the -- I made the payment

6   they wanted.

7   Q.    Okay.  And what happened after that?

8   A.    Well, they -- the payment was due on the 30th, but

9   on the 28th they had a -- they were going to sell my house.

10  They have a -- they have a notice in the paper that on

11  May 28th there's a sale and it was going to the court steps

12  two days before even the first payment that I made.

13  Q.    How did you find out about that?

14  A.    They sent me a notice.  I have notices.  And it was

15  in the newspaper.

16  Q.    I'm looking at Exhibit 4.

17        Could we put up Exhibit 4, please.

18        Do you recognize Exhibit 4?

19  A.    Yes.

20  Q.    What is it?

21  A.    Notice of Trustee's Sale.

22  Q.    That's the newspaper article you're talking about?

23  A.    Yes.

24        MR. BOURASSA:  Move that into evidence as

25  Plaintiff's Exhibit No. 4, Your Honor.

1          MR. BAYARD:  No objection, Your Honor.

2          THE COURT:  It's admitted.

3          (Plaintiff's Exhibit 4 received into

4          evidence.)

5          MR. BOURASSA:  And I apologize about the

6    terrible copy.  You know how that happens with newspaper

7    publications.  But we can blow it up one paragraph at a

8    time.

9    BY MR. BOURASSA:

10   Q.    So approximately what was the timeframe of having

11   the -- I'm sorry.  Strike that.  I already lost myself just

12   a tiny bit.

13          What was the timeframe of having the agreement

14   in place relative to this publication in the newspaper?

15   A.    Well, I got the agreement just a few weeks before I

16   made that -- a payment.  But they had -- and then they -- I

17   don't know the exact timeframe at this moment.  I cannot

18   remember.  I just know that they had it scheduled and was

19   continuing with the sale of the house two days before the

20   first payment that they -- that I made and they cashed it,

21   but they were still going and selling the house anyways.

22   Q.    What did you do at that point?

23   A.    I had to get an attorney to stop, emergency -- I

24   forget the name of it, it's called.

25   Q.    An injunction?

1    A.    An injunction to stop the sale of the house.

2              THE COURT:  Mr. Bourassa, I think you need to

3    highlight the remaining portions of the notice to show --

4              MR. BOURASSA:  Certainly, Your Honor.

5              THE COURT:  -- in order to identify the

6    property.

7              MR. BOURASSA:  Sure.  Mr. Blackburn, would you

8    scroll down, please.

9    BY MR. BOURASSA:

10   Q.    And you can see there at that, the last address on

11   the screen, that's -- and, again, I apologize for the

12   copies, but 1200 Broken Feather Court.  That's your

13   residence, correct?

14   A.    Yes.  And on -- up here on May 28th -- oops, it's

15   moving now.  On May 28th, the Alessi Trustee Corporation,

16   as duly appointed trustees -- that they are selling it on

17   May 28th at the court steps.

18   Q.    Okay.  So it was your understanding that despite you

19   entering into an agreement, they were going to sell your

20   property?

21   A.    Yes, absolutely.

22   Q.    What attorney did you hire?

23   A.    Pardon?

24   Q.    What attorney did you hire to file an injunction?

25   A.    Curtis Coulter.

1    Q.    Mr. Coulter assisted you in this case to some degree

2    before you retained me; is that right?

3    A.    Yes, he did.

4    Q.    So what was the outcome of your attempt to obtain an

5    injunction preventing this sale?

6    A.    Yeah, there was a stop on the sale.  Because it was

7    going through.  So Curtis Coulter was able to get an

8    emergency injunction, go in front of a judge and order the

9    sale of my property be stopped at that time.

10   Q.    Okay.  Did you have any contact with Alessi with --

11   you personally have any contact with Alessi, with respect

12   to this notice, this sale?

13   A.    No, just the letters that I was sending to him,

14   numerous letters before this, trying to get a payment --

15   trying to get the exact amount that was owed that they were

16   saying I owed.

17         And verbally I did speak to him once on the

18   phone, but it was very short, trying to get a payment plan.

19   Q.    All right.  Let's go ahead and take that down.

20         Now, let's skip ahead.  We'll talk about Exhibit

21   29.  Before we get to that, did you make any more payments

22   on that payment plan or just the one?

23   A.    No, the next month I made another payment of the

24   1491.27, I think it is.

25   Q.    Okay.  I think we have a copy of that check.

1              Do you recognize that check?

2      A.    Yes, I do.

3              MR. BOURASSA:  Okay.  Let's go ahead and move

4      that into evidence as Exhibit 60.

5              COURTROOM ADMINISTRATOR:  Are you just talking

6      about 29?

7              MR. BOURASSA:  I skipped back.

8              COURTROOM ADMINISTRATOR:  Oh, sorry.  So what --

9      it should be 59.

10             MR. BOURASSA:  Oh, did I not do 59?

11             MR. RICHARDS:  No, this would be Exhibit 59.

12     And this actually comes from Defendant's 503.  It's kind of

13     halfway in the stack.

14             THE WITNESS:  May I say something?

15             THE COURT:  Well, let's resolve it first.

16             Are you offering it at this time?

17             MR. BOURASSA:  Yes, Your Honor.

18             THE COURT:  Any objection?

19             MR. BAYARD:  What's the exhibit number, Your

20     Honor?

21             MR. BOURASSA:  It's going to be 59.  It's a

22     document out of your production.

23             MR. BAYARD:  With the other checks or a separate

24     exhibit?

25             MR. BOURASSA:  Separate exhibit.

```
 1            MR. BAYARD:  No objection, Your Honor.
 2            THE COURT:  It's admitted.
 3         (Plaintiff's Exhibit 59 received into
 4         evidence.)
 5    BY MR. BOURASSA:
 6    Q.    You were going to say something.
 7    A.    Yeah.  Could you enlarge it?
 8    Q.    Absolutely.
 9    A.    Because I hand-delivered this check, also.  And the
10    receiving date is right there.
11    Q.    Down at the bottom?
12    A.    No, that's not correct.  Well, they got it on the
13    24th.  But I can barely see that.  I guess the -- that's
14    weird.  But I hand-delivered that check to them, also.
15    Q.    Okay.  So that's your second payment on --
16    A.    Yes.
17    Q.    -- the payment plan that you were talking about?
18    A.    Correct.
19    Q.    Is that while your injunction was pending, or your
20    injunction had already been granted?
21    A.    Correct.  And the other side of that check would
22    show that Alessi cashed this check, too, Alessi Trustee
23    Corporation.  It went into their bank account at Wells
24    Fargo.
25    Q.    Once the injunction was granted, what did you do?
```

1    A.    Well, I had made two payments at this point.  Both

2    checks did not go to ArrowCreek.  They were cashed by

3    Alessi Trustee Corporation.

4            So Curtis Coulter, my attorney at that time,

5    said that they're not supposed to be doing that and stop

6    making any more payments because you're not getting

7    credited.  This is $3,000 at this point, and it's not going

8    towards my HOA dues.

9    Q.    Okay.  Let's look at Exhibit 18.  Exhibit 18 is

10   three pages.

11           Do you recognize that document?

12   A.    Yes, I do.

13   Q.    What is it?

14   A.    This is -- just a minute.  It's moving.  Okay.  On

15   March -- yes, this -- let me read it.  Just a second.

16           Yes, this is an e-mail to Aileen Ruiz, their

17   secretary, from -- just a second.  Let me double check.

18   Yeah, melindaellis@sbcglobal.  I e-mailed her trying to

19   find out what's going on with my payments because --

20   Q.    I'll stop you right there.

21   A.    Okay.

22   Q.    So you recognize the document?

23   A.    Yes.

24   Q.    It's an e-mail between you and Alessi -- an Alessi &

25   Koenig employee; is that right?

1    A.    Yes.

2              MR. BOURASSA:  And we'd go ahead and move that

3    into evidence as Plaintiff's 18.

4              MR. BAYARD:  Objection, Your Honor, on the

5    grounds of relevance.  This is an e-mail dated March 13th,

6    2013, years after the sequence of events that we're talking

7    about.

8              MR. BOURASSA:  And it substantiates what the

9    witness testified to with respect to allocation of the

10   $1400 payments, Your Honor.

11             THE COURT:  All right.  Well, it's premature at

12   this time because it's referring to events that occurred

13   after 2008.  Assuming that you can establish the foundation

14   on those other events, I'll admit the exhibit.

15             MR. BOURASSA:  As a point of clarification, Your

16   Honor, since it's only on your screen, if I could have

17   Mr. Blackburn highlight the 7/21/2008 entry below in the

18   response from the Alessi employee.  That clarifies Alessi's

19   response as to how they allocated funds.

20             MR. BAYARD:  Your Honor, also objection on

21   hearsay grounds.  The testimony is that the person who sent

22   the e-mail is a secretary.  She's not an officer or

23   director or member of either of the defendants, so

24   therefore it's not admissible as a statement of a party

25   opponent.  So it's inadmissible hearsay.

1           THE COURT:  All right.  I'm going to reserve

2     ruling on it.  I need to take a closer look at it myself.

3           MR. BOURASSA:  Certainly, Your Honor.

4     BY MR. BOURASSA:

5     Q.    So, Ms. Ellis, the reason that you stopped payment

6     was what, exactly?

7     A.    Because the payments were not going to offset my

8     HOAs that I was behind, they were going to the collection

9     agency or law office, whatever they were, as Alessi Trustee

10    Corporation.

11    Q.    And so when we go back and we look at Exhibit 12,

12    and we see that 1491.39 down at the bottom, it's your

13    understanding that that payment of 1491.39 was not applied

14    to your past due balance with ArrowCreek?

15    A.    Correct.  It was not.

16    Q.    What do you understand was done with that money?

17    A.    That Alessi Trustee Corporation, that went to them.

18    Q.    So that didn't reduce your balance with the

19    association?

20    A.    No, not at all.  Neither did the next payment.

21    Q.    All right.  Now we can move on to 29.

22          Do you recognize this document?

23    A.    Yes, I do.

24    Q.    What is it?

25    A.    This is another lien on the property, now from

1    Alessi & Koenig.

2              MR. BOURASSA:  All right.  Let's go ahead and

3    enter that as Plaintiff's 29.  It's two pages.  Second page

4    is a notary page, Your Honor.  We would move that into

5    evidence.

6              MR. BAYARD:  No objection, Your Honor.

7              THE COURT:  It's admitted.

8         (Plaintiff's Exhibit 29 received into

9         evidence.)

10   BY MR. BOURASSA:

11   Q.    So what's the date on this document?

12   A.    November 19th, 2008.

13   Q.    I think that's the recording date.  I think the date

14   at the bottom was the date I was referring to.  But it's

15   the 18th.  I don't think it's of any consequence.

16   A.    Yeah, November 18th.

17   Q.    What property is this applied to?

18   A.    1200 Broken Feather.

19   Q.    All right.

20   A.    My house.

21   Q.    What is the amount of this lien?

22   A.    Now it's 7,200 -- no, $7,021.28.

23   Q.    Do you have an understanding as to how that amount

24   is calculated?

25   A.    No, I don't.

1    Q.    And just harkening back to Exhibit 12, in Exhibit

2    12, they had you owing $6,472.27.  Do you know what the

3    difference was there?  Do you know why there's a difference

4    in charges?

5    A.    Well, less the one payment that I made, that they're

6    showing that I made on -- in May, of the 1491.39.

7    Q.    Right.  Do you know what amounts for the increase in

8    the lien amount from the May 23rd, 2008, letter that they

9    sent you to the November 18, 2008, lien that they filed?

10   A.    No, I don't.

11   Q.    Did you ever receive an explanation as to why the

12   collection entity changed from Alessi Trustee Corporation

13   to Alessi & Koenig?

14        MR. BAYARD:  Objection.  Calls for hearsay.

15        MR. BOURASSA:  The question was only if she ever

16   received any information.

17        THE COURT:  Well, lay some greater foundation,

18   from whom.

19        MR. BOURASSA:  Certainly.

20   BY MR. BOURASSA:

21   Q.    From your association or from Alessi, did anyone

22   ever explain to you the transition from someone different

23   handling your account?

24   A.    No, not at all.

25   Q.    Did you attempt to contact Alessi & Koenig with

1    respect to this particular lien?

2    A.    Well, my attorney would have at this point because I

3    had an attorney.

4    Q.    All right.  Let's move to Exhibit 25.

5          Do you recognize that document?

6    A.    Yes.

7    Q.    What is that document?

8    A.    Well, it's -- can you make it smaller so we can see

9    the top, please.

10         Okay.  So the Notice of Delinquent Assessment

11   Lien.

12         MR. BOURASSA:  Okay.  I'd like to move that into

13   evidence as Exhibit 25.

14         MR. BAYARD:  No objection, Your Honor.

15         THE COURT:  It's admitted.

16         (Plaintiff's Exhibit 25 received into

17         evidence.)

18   BY MR. BOURASSA:

19   Q.    What's the date at the bottom of this particular

20   lien?

21   A.    November 20th, 2008.

22   Q.    Let's put that -- the amount due on that is how

23   much?

24   A.    Now it's $10,491.07.

25   Q.    And how much represents collection costs, according

1    to this document?

2    A.    $5,685 represent collection.

3    Q.    And then --

4    A.    And attorneys' fees.

5    Q.    Then there's another $50 charge for other issues,

6    right?

7    A.    Right.

8    Q.    And 1200 Broken Feather, that's still your property,

9    your home, right?

10   A.    Yes.

11   Q.    Okay.  That's the mailing address I just -- right

12   above that is the Broken Feather issue.

13         Let's go ahead and put that side by side with

14   Exhibit 29.

15         And I call your attention to the dates.  If you

16   could see that the Exhibit 29 on the right-hand side of the

17   screen is November 18, 2008.  Is that right?

18   A.    Right.

19   Q.    And as we recall up at the top, it was recorded on

20   November 19, 2008?

21   A.    Right.

22   Q.    And then looking at Exhibit 25 right next door on

23   the left, we see that the date of that is November 20th?

24   A.    Correct.

25   Q.    And that it was recorded, I think, four days later,

1    on November 24th?

2              Mr. Blackburn, if you would scroll to the top of

3    that exhibit.

4    A.    Yeah, November 24th was the document.

5    Q.    Okay.  Were you confused that Alessi was trying to

6    charge you $7,021.28 as of November 18th and was it

7    $10,491.07 on November 20th?

8    A.    Yes.  And they're both on 1200 Broken Feather Court.

9    Q.    What was your reaction when you received those two

10   liens?

11   A.    Shocked and helpless.

12   Q.    Did you ever receive any explanation from Alessi as

13   to why they recorded two liens in two different amounts

14   within five days?

15   A.    No.  I've never received any explanation on any of

16   the liens.

17   Q.    As you sit here today, do you believe that as of

18   November 20, 2008, $10,491.07 was the accurate past due

19   assessments and charges for 1200 Broken Feather Court?

20   A.    No, not at all.

21   Q.    What about with respect to -- I believe it's

22   Exhibit -- what is it -- 29.  Did you believe on

23   November 18, 2008, that the accurate past due assessments

24   and charges on that property were $7,021.28?

25   A.    No, that's not accurate.

1   Q.    What did you do about it?

2   A.    There's nothing you can do when they put a lien on

3   your property, except my attorney -- to have an attorney.

4   Q.    Okay.  At what point in time did you list your

5   property for sale?  Did you ever try to sell either one of

6   these properties?

7   A.    Oh, yeah.  The lot has been for sale since 2004, I

8   think it is, 2004 or 2005.  The lot.

9         And then I also had the house up for sale.  The

10  lot's still for sale.  Well, it was up for sale all the way

11  up to six months ago.

12  Q.    Has it been listed on the MLS?

13  A.    Yes, all the way since 2005 -- '4 or '5.  I think

14  '5, 2005 --

15  Q.    Okay.

16  A.    -- started.

17  Q.    All right.  With respect to the house, what have

18  been your activities in putting that up for sale?

19  A.    It's now not up for sale.  But it was up for sale

20  for a period of time.

21  Q.    What period was that, approximately?

22  A.    2000 -- well, the house was 2005 to, let's see,

23  about, I think, 2008.  Approximately.  But the lot has been

24  the whole time.

25  Q.    And the house was listed on the MLS as well?

1    A.    Yes.

2    Q.    Who was your Realtor with respect to that

3    transaction or attempt to sell the house?

4    A.    I've had a couple.  David Reed was one of the

5    Realtors.  And then -- I can't think of his name right now.

6    I just went blank.  I can't think of the Realtor at the

7    moment.

8         Well, it's been -- it will come to me.  I'm

9    sorry.  I apologize.  I just went blank.  Clay Alder.

10    Q.    And that's with respect to the house?

11    A.    Clay Alder has had the lot and the house.  And then

12    I had a couple Realtors on the house.  I can't remember

13    their names right now.

14    Q.    Well, if it comes to you --

15    A.    I'd have to look it up.

16    Q.    If it comes to you, let me know.

17    A.    Okay.

18    Q.    Did you receive any offers on the house during that

19    timeframe?

20    A.    Yes, I did.

21    Q.    What kind of offers did you get?

22    A.    I had one was -- back then it was 1,100,000.

23    Q.    That was in 2005, right?

24    A.    Yes.

25    Q.    I think we have documentation of that produced in

1    our files.  So we might be able to talk about that.

2              But the liens weren't on your property until

3    2007, right, June of 2007?

4    A.    Right.

5    Q.    What happened in that 2005 transaction that it

6    didn't go through?

7    A.    I had -- that was when the homes were very high.  So

8    it was actually at a million two something, a million two

9    thousand, so it was a hundred thousand dollar low offer

10   back then.

11   Q.    Okay.

12   A.    And so I didn't take that offer in 2005.

13   Q.    Okay.  Buyer -- seller's remorse?

14   A.    Now, it is.

15   Q.    With respect then to any offers that you've had

16   since the lien was placed on the property, what kind of

17   action or interest have you seen since June 1 of 2007?

18   A.    On the house or the lot?

19   Q.    On the house?

20   A.    No, I took it off the market.  Once all these liens

21   went on the property, I was not going to sell it for all

22   these liens that I don't owe, and so I took it -- I took it

23   off the market.  It was on for a couple years, but I took

24   it off.

25   Q.    Okay.  And you said --

1   A.    Until this gets -- got settled.  I thought it would

2   be settled a long time ago.

3   Q.    Sure.  Approximately what time did you take it off

4   the market?  What date?

5   A.    Oh, gosh.  '8, '9 -- '9.  Maybe 2009.  '10.  I would

6   have to look it up.  I'm sorry.  I didn't know you were

7   going to ask this.

8   Q.    That's all right.  This lawsuit was filed when,

9   July of 2009?

10  A.    Yeah.  Oh, the lawsuit?

11  Q.    Yes, this lawsuit.

12  A.    Oh, no --

13  Q.    The reason we're all in the room today.

14  A.    No, November of 2008.

15  Q.    I think it's 2009.  It might have started in

16  something else in 2008.

17  A.    Yeah.  No, it was 2008.

18  Q.    Okay.

19  A.    I think.  As I recall.

20  Q.    All right.  During the pendency of the lawsuit, have

21  you made any attempt to sell the house?

22  A.    Yes, during this lawsuit, yes.

23  Q.    What have you done?

24  A.    I had it listed in the MLS.

25  Q.    Okay.  And have you had any offers on the home

1    during the pendency of this lawsuit?

2    A.    No, I have not.

3    Q.    Do you have -- strike that.

4          All right.  Let's go ahead and go back and do a

5    little more digging here.

6          Let's look at, let's see, Exhibit 31.

7          Mr. Richards got me back on track.

8          With respect to -- I'm sorry.  You can take that

9    down, Mr. Blackburn.

10         With respect to making payments on the property,

11   when did you resume making monthly assessment payments?

12   A.    After the -- let's see.  Let me think.  After the --

13   well, after the lawsuit was in the court, and so then it

14   was safe, so then I started making my payments because

15   they're all documented at that point.

16         So I would say there was a year that I did not

17   make the payments.  So 2009?

18   Q.    Okay.  So in 2009 you started making payments --

19   A.    Yes.

20   Q.    -- again?

21   A.    Regularly.

22   Q.    And when we say payments, what exactly are you doing

23   with respect to this property?

24   A.    Make my payments every month.

25   Q.    To who?

1    A.    Two payments every month on one check, but I

2    document it on the check.

3    Q.    I'd like to look up, let's see, Exhibit 21, please.

4    And Exhibit 21 is a very large number of pages.

5          Are you familiar with Exhibit 21, the big stack

6    of checks and receipts?

7    A.    Yes, those are the --

8    Q.    Are those the payments that you made?

9    A.    Yeah.  Those are the coupons that come with your

10   payments to show each lot, the house and the lot, and then

11   the amount that I made.

12         MR. BOURASSA:  Your Honor, we would move the

13   entirety of Exhibit 21 into evidence.

14         THE COURT:  When you say the entirety, what are

15   you referring to?

16         MR. BOURASSA:  It's approximately 50 pages.  Oh,

17   82 pages.  82 pages of checks and receipts for HOA payments

18   made after January of 2009.

19         THE COURT:  Any objection?

20         MR. BAYARD:  That's a lot of exhibit, Your

21   Honor, to look at.  Can we please have one second?

22         Your Honor, I have an objection.  Some of the

23   documents are actual copies of checks.  For some checks

24   there's a copy of the front and a copy of the back,

25   indicating it was negotiated.

1          There are handwritten pages in here.  It's not

2     clear who wrote those.

3          And so I don't think we can stipulate to the

4     admissibility of the entire exhibit.

5          THE COURT:  I'll give you a moment to indicate

6     which ones you can stipulate to so that maybe we can

7     shorten this process.

8          MR. BAYARD:  Your Honor, we can stipulate to the

9     first page of Exhibit 21, which is a check dated January

10    23rd, 2009, check number 2243, in the amount of $415.

11         On page 2 of Exhibit 21, there are copies of

12    apparently unrelated checks.  But it looks like the last

13    check is a duplicate of check number 2243, that was also on

14    the first page.

15         MR. BOURASSA:  If it would save time for the

16    Court's staff and so forth, we're happy to just hold this

17    aside for the time being to allow counsel to go through and

18    pick out any pages he's uncomfortable with for separate

19    address.

20         THE COURT:  Let's do that.  What I'll ask that

21    you do is, Counsel, to review the exhibit at the conclusion

22    of the day and see what you can agree upon, and advise the

23    Court what you haven't agreed upon, and we'll deal with

24    that as necessary.

25         MR. BOURASSA:  Understood, Your Honor.  It's our

```
1    intention to produce a demonstrative exhibit that just has

2    a spreadsheet of the charge, the payment, and just going

3    from that date forward to really make it a lot easier for

4    the jury to not have to deal with 83 pages of checks.

5             THE COURT:  Okay.  Well, as you know, you've got

6    to have the exhibits in first.

7             MR. BOURASSA:  Of course.  Of course.

8             THE COURT:  So we'll do first things first and

9    take it from there.

10            MR. BOURASSA:  Absolutely, Your Honor.

11   BY MR. BOURASSA:

12   Q.   All right.  Let's go ahead and turn to Exhibit 36.

13            Do you recognize that document?

14   A.   Yes.

15   Q.   What is it?

16   A.   Can you go up to the top again a second -- just a

17   minute?  It's a -- yeah, it's another collection.  Let's

18   see.  Wait a minute.  If you could scoot --

19   Q.   All right.

20   A.   Can you condense it?

21   Q.   It's another collection letter from Alessi?

22   A.   Yes.

23   Q.   Okay.

24            MR. BOURASSA:  We would move that into evidence

25   as the next exhibit in order, 36.
```

1           MR. BAYARD:  Your Honor, my Exhibit 36 is

2     addressed to me.  I'm not sure what's going on.

3           THE COURT:  This one is too.

4           MR. BOURASSA:  It is, Your Honor.  But it's a

5     record of the demand letter at that point in time.  And I

6     don't know what counsel's production was to us, but --

7           MR. BAYARD:  I would note, Your Honor, that

8     nowhere on this exhibit does it reference plaintiff,

9     plaintiff's address.  There's nothing on this document that

10    indicates it was ever received by her other than as a

11    statement of account produced through discovery.

12          THE COURT:  I'll allow you to go back over it,

13    if you would like, Mr. Bourassa, to see if your client can

14    verify it.

15          But at this point in time I don't think it's

16    admissible.

17          MR. BOURASSA:  Sure.

18    BY MR. BOURASSA:

19    Q.    All right.  Let's go ahead and look at Exhibit 38.

20          Do you recognize this document?

21    A.    Yes.  It's another lien on my property.

22          MR. BOURASSA:  Go ahead and move that into

23    evidence, Exhibit 38.

24          MR. BAYARD:  No objection, Your Honor.

25          THE COURT:  It's admitted.

1              (Plaintiff's Exhibit 38 received into

2              evidence.)

3      BY MR. BOURASSA:

4      Q.    All right.  Let's scroll down to the bottom and see

5      what the date on this document is.

6      A.    December 4, 2012.

7      Q.    Okay.  As of December 4th, 2012, based on your prior

8      testimony, you had been making regular payments, I'm not

9      saying you were perfect every month, but had been keeping

10     up with your assessments since January of 2009; is that

11     right?

12     A.    Yes.  Every single month I've made my payments all

13     the way to now.

14     Q.    Okay.  And like I said, you might have missed a

15     month but then made it up the next month or something like

16     that?

17             MR. BAYARD:  Objection.  Leading.

18             THE COURT:  Sustained.

19             THE WITNESS:  I made them every single month.

20     If there was -- I think there was one month that I was late

21     and then I made two in a month.  But, otherwise, I've made

22     every single month on a monthly basis.

23     BY MR. BOURASSA:

24     Q.    Understood.  All right.  So with respect to Exhibit

25     38, can you tell me what address that applies to?  It's the

1    second paragraph down at the bottom.

2    A.    1200 Broken Feather Court, the -- my home.

3    Q.    All right.

4              JUROR:  We don't have it.

5              MR. BOURASSA:  Oh, I'm sorry.  Move that into

6    evidence, I believe.

7              MR. BAYARD:  I thought we already did, but

8    there's --

9              THE COURT:  I think it's in.

10             MR. BOURASSA:  Yes.  All right.  As long as the

11   jury has it --

12             JUROR:  It's not showing.

13             MR. BOURASSA:  All right.

14        (Discussion held off the record.)

15             THE COURT:  Computer age, ladies and gentlemen.

16   We all deal with it.  Let's move along as best we can.

17             MR. BOURASSA:  As fortune would have it, Your

18   Honor, of course, this is the biggest of the liens.

19        (Discussion held off the record.)

20   BY MR. BOURASSA:

21   Q.    All right.  I'm sorry.  Did we get the date of this

22   in, December 4 --

23             COURTROOM ADMINISTRATOR:  Hold on one second.

24   Let me just try something.

25             MR. BOURASSA:  It's on the big screen.  That's

1    sufficient.

2    BY MR. BOURASSA:

3    Q.    As I recall, this was, what, December 4th, 2012,

4    down at the bottom; is that right?

5    A.    Let's see.  Yeah.  December 4th, 2012.

6    Q.    And I think we just said it applies to your home.

7    A.    My home only.

8    Q.    Can you tell me what the lien is on this

9    particular -- or the amount due as alleged on this

10   particular lien?

11   A.    $32,510.96.

12   Q.    And so do you have any understanding of how you went

13   from 2009, when you had started making all of your

14   payments, to a $32,000 balance allegedly due and owing?

15   A.    No.  Because as of January 23rd, every single

16   payment's been made.  So I'm not late on any payments from

17   2009 all the way to today.  And there was just the 2007,

18   '08 that I was behind.

19              So why are they -- keep adding --

20   Q.    Is it your -- is it your belief that with respect to

21   the amount of $32,510.96, is that an accurate amount due

22   and owing at the time this was, December 4th, 2012?

23   A.    Absolutely not.  No.  I've made every payment.  I

24   don't know how it keeps increasing and they keep adding

25   more liens.

1    Q.    All right.  Let's go to Exhibit 40, please.

2          Do you recognize that document?

3    A.    Yeah, 2013, yeah.

4    Q.    What is it?

5    A.    It's another lien.

6          MR. BOURASSA:  Okay.  Move that into evidence,

7    Your Honor.

8          THE WITNESS:  On 1200 Broken Feather Court.

9          MR. BOURASSA:  We would move that into evidence,

10   Your Honor, as 40.

11         MR. BAYARD:  No objection, Your Honor.

12         THE COURT:  All right.  It's admitted.

13         (Plaintiff's Exhibit 40 received into

14         evidence.)

15         MR. BOURASSA:  Thank you, Judge.

16   BY MR. BOURASSA:

17   Q.    Scroll down to the bottom, and we can see the date

18   on this document is March 18, 2013?

19   A.    Correct.  Yes.

20   Q.    And this property address also is the 1200 Broken

21   Feather house, right?

22   A.    Yes, 1200 Broken Feather.

23   Q.    And what's the amount that's due on this lien?

24   A.    I can't see the amount.  $9,236.64.

25   Q.    Do you have any idea as to whether that was an

1    accurate amount as of March 18, 2013, for any past due

2    assessments, charges, anything else related to 1200 Broken

3    Feather Court?

4    A.   No.  This isn't just another lien added to all the

5    other, the 32,000 and all the other liens.

6    Q.   Looking back at the Exhibit 38, the $32,000 lien,

7    and -- I'm just wondering, did you pay $23,000 to Alessi or

8    to ArrowCreek in between these two liens?

9    A.   No, absolutely not.

10    Q.   Did you make your regular HOA payments?

11    A.   Yes, every single month.

12    Q.   Do you have any understanding as to what the $23,000

13    difference is between the two liens?

14    A.   No.  I'm completely confused.

15    Q.   What did you do when you received this lien?

16    A.   Well, I wasn't as bad as the $32,000 lien, but,

17    yeah, I just -- I'm just flabbergasted.  I'm -- I don't --

18    I have -- I don't know what to say.

19         I was shocked.  I'm totally shocked.  I don't

20    know why I keep getting liened more and more as I make the

21    payments every month.  Because we're only talking about '7

22    and '8 is when I was behind on the payments.

23    Q.   All right.  And then let's turn to Exhibit 42,

24    please.

25         Do you recognize that document?

1    A.    Can you make it a little bigger for the date,

2    please?  Is that August?  Yeah, yeah, August -- okay.

3    Yeah, August 20th.  Okay.

4              So that's another lien.

5    Q.    Okay.

6    A.    And that's now on my -- my -- it's raw land is

7    the -- 5835 Flowering Sage is my property that's

8    undeveloped up in ArrowCreek.

9    Q.    Okay.  That's the 5835 Flowering Sage.  I'm sorry.

10   I have two documents stuck in my Exhibit 42.  That's

11   because I have no documents stuck in my Exhibit 41.

12             All right.  Go to Exhibit 41.  I'm sorry.

13             All right.  With respect to Exhibit 41, do you

14   recognize that document?

15   A.    Okay.  Okay.  So this is 1200 -- okay.  This is my

16   house, 1200 Broken Feather Court, July of 2013.

17   Q.    All right.  And so the same thing, this is June 28,

18   2013, is the signature time -- or signature date.

19   A.    Yeah, 6/28/13.

20   Q.    Okay.

21   A.    But it was recorded, I guess, 7/1/2013.

22             MR. BOURASSA:  Your Honor, we would move Exhibit

23   41 into evidence.

24             MR. BAYARD:  No objection, Your Honor.

25             THE COURT:  It's admitted.

```
 1              (Plaintiff's Exhibit 41 received into
 2         evidence.)
 3    BY MR. BOURASSA:
 4    Q.    All right.  So we were talking about Exhibit 40.
 5    Actually, we were talking about -- let me just get the
 6    chronology here.  We were talking about Exhibit 38, which
 7    is a $32,000 lien.
 8              Did you receive anything from Alessi or
 9    ArrowCreek regarding any reason to reduce their $32,000
10    lien prior to them sending you the March 18, 2013, lien for
11    $9,236?
12    A.    No, nothing.
13    Q.    All right.  And that would be Exhibit 40 that we
14    talked about.
15              Now we're looking at Exhibit 41.  And what's the
16    amount due on Exhibit 41?
17    A.    Okay.  That's 8,025 -- 8,025.23.
18    Q.    Okay.  Could we put 41 and 40 side by side.  And the
19    amount due on Exhibit 40 was the $9,236.64, correct?
20    A.    Correct.  Yes.
21    Q.    And the amount due on Exhibit 41, three months
22    later, is $8,025.23?
23    A.    Correct.
24    Q.    Do you have any understanding of why that number
25    changed?
```

1    A.    Absolutely do not.

2    Q.    All right.  So, so far as I can see, that's the last

3    lien that was put on the Broken Feather property.

4          MR. BAYARD:  Objection.  Leading.

5    BY MR. BOURASSA:

6    Q.    Do you have any understanding of any additional

7    liens since them?

8          I'm sorry.  I'm finishing my question.

9          THE COURT:  I'll allow the question in light of

10   the part that followed the objection.

11         THE WITNESS:  No, I think July 2013 is the last

12   time they added more liens.  The last lien that I know

13   they've added to it, to the property.

14         MR. BOURASSA:  Okay.

15   BY MR. BOURASSA:

16   Q.    Do you have an understanding as to whether as of

17   July 2013, the $8,025.23 number was accurate with respect

18   to what you owe the association?

19   A.    No, I do not.

20   Q.    All right.  Well, that takes care of one property

21   with respect to the liens.  And now we're going to move on

22   to the Flowering Sage property.  And I'll try to move

23   through it just a little bit quicker because I know this is

24   really not exciting.

25         All right.  Let's go ahead and look at Exhibit

1   No. 8, please.

2          Do you recognize that document?

3   A.    Yeah.  Can you make the date a little bigger,

4   please?  Yeah.  So that was -- yeah, June 14.  That's the

5   first lien on -- I think this would be the lot.

6   Q.    This is the Flowering Sage property, right?

7   A.    Yes, the Flowering Sage, yes.

8   Q.    Again, Flowering Sage, is it vacant?

9   A.    Yeah.  It's a -- it's ready to be built on it.  I

10  mean, it has sewer, water, it's ready to go, to be built on

11  in ArrowCreek.

12  Q.    Okay.

13         MR. BOURASSA:  We'll move that document into

14  evidence.  That's Exhibit 8, please.

15         MR. BAYARD:  Your Honor, Exhibit 8 appears to be

16  two separate documents.  We have no objection to page 1 of

17  the exhibit being admitted.

18         MR. BOURASSA:  How about we take out page 2?

19         MR. BAYARD:  That will work.

20         THE COURT:  All right.  It's admitted.

21         (Plaintiff's Exhibit 8, page 1 received into

22         evidence.)

23  BY MR. BOURASSA:

24  Q.    With respect to Exhibit 8, could you tell us the

25  amount that Alessi Trustee Corporation is alleged is due

1    and owing at that point in time?

2    A.    Yes, $2,737.25.

3    Q.    Okay.  Now, is this the same timeframe that we're

4    talking about in 2007 with Flowering Sage property as we

5    were with the Broken Feather property, your financial

6    condition, of course, is the same?

7    A.    Yeah.  I was equally behind, because I make both lot

8    payments.  So, I mean, I got behind in 2007, tried to get

9    current in 2008, but my attorney said to stop making any

10   further payments until the money that I was applying went

11   to ArrowCreek.

12          And so then I start -- January 23rd was my very

13   first -- January '09 was my first payment.  So that was the

14   two years we're talking about right there.

15   Q.    So it would correspond to both lots?  If you missed

16   a payment on one lot, you would have missed a payment on

17   the other lot?

18   A.    Yes.  I always made the two together.  You get your

19   coupon stubs, you know, for the lot and the house.  I

20   always made them together, at the same time, on one check

21   and would say two lots.

22   Q.    Okay.  What's your understanding of how many months

23   behind you were on the Flowering Sage property as of June

24   of 2007?

25   A.    I was the exact same amount behind as the home.

1    Q.    Do you have an understanding of why the lien number

2    differs from the Flowering Sage property to --

3    A.    They would many times, even though I would send the

4    separate stubs in saying that lot -- ArrowCreek lot and the

5    house, and I would put on the check two lots, and then I

6    would even put the number -- I always put the numbers on

7    the check, lot -- this lot 210 and lot -- I forget what the

8    other one was.

9          But they would still sometimes take it and put

10   it all to one or all to the other.  And so their accounting

11   was always off.

12   Q.    Do you have an --

13   A.    It seemed like.

14   Q.    -- understanding as to whether --

15   A.    Numerous.

16   Q.    -- $2,737.25 was an accurate accounting of the past

17   due balance on Flowering Sage as of June 1, 2007?

18   A.    No, I don't know if that's accurate.

19   Q.    Do you dispute that number?

20   A.    Yes.

21   Q.    All right.  Let's look at Exhibit No. 6.

22         Do you recognize that document?

23   A.    February 6, 2008.  And this is for the lot.

24   Q.    Do you recognize it?

25   A.    Yes.

1              MR. BOURASSA:  We would move Exhibit 6 into

2       evidence, Your Honor.

3              THE COURT:  Any objection, Mr. Bayard?

4              MR. BAYARD:  Yes, Your Honor.  The object- -- or

5       this document appears to have been modified.

6              There is a line through the first sentence in

7       paragraph 4 with a handwritten notation.  It doesn't

8       reflect how the document would have been recorded.  It

9       looks like this document has been altered for some reason.

10             THE COURT:  All right.

11             Mr. Bourassa, can you --

12             MR. BOURASSA:  Certainly, Your Honor.  I would

13      advise the Court that in a number of the lien documents

14      reflecting Flowering Sage Trail, the -- whether it's auto

15      correct or something suggests, perhaps as a premonition of

16      what's going to happen, Flowering Sage trial, which has

17      been corrected, we don't know by who on this particular

18      document, but is uncorrected on a number of other

19      documents.

20             This is what Alessi has produced to us, not

21      something that we produced, Your Honor.

22             THE COURT:  Okay.  Are the differences on the

23      changed documents between trail and trial the same

24      throughout?  Is that the same type of correction that would

25      appear to have been made?

1              MR. BOURASSA:  It is my recollection, Your

2    Honor, that this is the only sheet that has the line out

3    and the typewritten -- or, excuse me, the handwritten trail

4    in place of the word trial.

5              THE COURT:  All right.  I'll admit it with the

6    instruction to the jury to draw no inferences over the

7    deletion that appears to be handwritten and the word trail

8    is in there.  The balance of the document appears properly

9    admissible.  And the jury should draw no inference from the

10   one interlineation one way or the other.

11             MR. BOURASSA:  Thank you, Your Honor.

12   BY MR. BOURASSA:

13   Q.    Could you see the date on this particular document

14   at the signature line?

15   A.    Yes, February 3rd, 2008.

16   Q.    And is it your understanding that this particular

17   lien applies to the Flowering Sage property?

18   A.    Yes.

19   Q.    And what's the amount alleged to be due on this

20   particular lien?

21   A.    $6,405.93.

22   Q.    Do you have any understanding as to where the

23   additional 55-, $5600 -- excuse me, strike that, the 35- or

24   $3600 difference between this document and Exhibit 8 that

25   we just looked at, where that difference --

```
 1              MR. BAYARD:  Objection, Your Honor.  Counsel's

 2     testifying as to the mathematics.  I haven't had a chance

 3     to do the --

 4              THE COURT:  To check the math?  I'll allow the

 5     question and caution Mr. Bourassa to try and clarify --

 6     well, rephrase the question, Mr. Bourassa.

 7              MR. BOURASSA:  Sure, Your Honor.

 8              THE COURT:  That would be the better way to do

 9     it.

10              MR. BOURASSA:  Sure.

11     BY MR. BOURASSA:

12     Q.    You recall Exhibit 8 was seeking approximately

13     $2,737.25 from you, correct?

14     A.    Yes.

15     Q.    And this particular document is seeking $6,405.93

16     from you.  Do you know what the difference is or why

17     there's a difference there?

18     A.    No, I do not.

19     Q.    Do you have any understanding of where the

20     additional charges came from beyond just your regular

21     assessments for this property?

22     A.    No, I do not.  I have no idea.

23     Q.    That saves me from doing math anyway.

24              So that's already admitted into evidence.  Let's

25     go to the next one, which is Exhibit 3.
```

1          MR. BOURASSA:  Ms. Clerk, has Exhibit 3 been

2     admitted previously?

3          COURTROOM ADMINISTRATOR:  No, it has not.

4     BY MR. BOURASSA:

5     Q.    Do you recognize this document?

6     A.    Yeah.  Notice of Trustee's Sale.  Yes, I do.

7          MR. BOURASSA:  We would move Exhibit 3 into

8     evidence, Your Honor.

9          THE COURT:  Mr. Bayard?

10          MR. BAYARD:  Your Honor, there are three

11     different pages in Exhibit 3.  I'm just trying to compare

12     them to see if they're duplicates.

13          MR. BOURASSA:  I think I just want the first

14     page, Your Honor.  I'll take out the other two.

15          MR. BAYARD:  No objection to the first page,

16     Your Honor.

17          THE COURT:  All right.  It's admitted.

18          (Plaintiff's Exhibit 3, page 1 received into

19          evidence.)

20          MR. BOURASSA:  Thank you, Your Honor.

21          Just as a point of clarification when we look at

22     the address on this particular page, the Flowering Trail,

23     Flowering Sage Trail, just note for the Court that there

24     is the misspelling of trail as trial that we referenced

25     earlier.

1    BY MR. BOURASSA:

2    Q.    All right.  You can see the date on your screen,

3    April 30, 2008.  And do you have an understanding as to --

4    I'm sorry.  How much are they asking for?

5    A.    Excuse me.  Their screen is blank.  Is it supposed

6    to be?

7              MR. BOURASSA:  We moved that into evidence, I

8    think.

9              THE WITNESS:  Oh, there you go.  Now it's not.

10             MR. BOURASSA:  Thank you so much.

11             THE WITNESS:  Okay.

12             THE COURT:  Well --

13             THE WITNESS:  $7,715.93.

14   BY MR. BOURASSA:

15   Q.    And the date on that document is April 30, 2008; is

16   that correct?

17   A.    Correct.

18   Q.    Do you have an understanding of the additional

19   charges in this particular lien since the February 3rd lien

20   of 6,405.93?

21   A.    No, I do not.

22   Q.    Now, this is still before you've gotten an attorney,

23   right?

24   A.    Let me see.  What's the date again?

25   Q.    April 30, 2000 --

1    A.    April 30th --

2    Q.    -- 8.

3    A.    Let me think.  Just a minute.  Correct.  Because

4    it's May 30th -- May 28th is when the sale of my house was.

5    So this is before I had an attorney, correct.

6    Q.    Okay.  Did you contact Alessi with respect to this

7    notice?

8    A.    No.  Well, I sent letters, yes.  I'm sorry.  I have

9    numerous letters I sent to them asking for urgent

10   explanation, What are these charges and what are they for?

11   Q.    Okay.  Did you receive a response?

12   A.    No, I never did.

13   Q.    All right.  Let's look at Exhibit 27.

14         Do you recognize that document?

15   A.    Yes.  It's another lien.

16         MR. BOURASSA:  Move Exhibit 27 into evidence,

17   Your Honor.

18         MR. BAYARD:  No objection, Your Honor.

19         THE COURT:  It's admitted.

20         (Plaintiff's Exhibit 27 received into

21         evidence.)

22   BY MR. BOURASSA:

23   Q.    And this is another lien on the Flowering Sage

24   property; is that right?

25   A.    Yes, it is.

1    Q.    And what's the date on this particular lien?

2    A.    November 17th, 2008.

3    Q.    And what's the amount that's due and owing alleged

4    on this particular document?

5    A.    $7,715.93.

6    Q.    Isn't that exactly the same amount that was liened

7    on the property on April 30, 2008, in Exhibit 3?

8    A.    I'd have to see that document.

9    Q.    Let's put Exhibit 3 up next to Exhibit 27, please.

10         So are those two numbers the same, the number

11   for Exhibit 3, $7,715.93 at the bottom?

12   A.    Yeah, I see it on that one.  Now, let me see it on

13   the other one.

14         Oh, yes, it is, $7,715.93.  Same amount.

15   Q.    Now, you hadn't made -- you're still in the

16   not-making-payment-stage there, weren't you?  Oh, no, you'd

17   made the -- you'd made a payment.  You were on the payment

18   plan.  What was going on?

19   A.    I made the May and June payment.  So I made the May

20   and June of --

21   Q.    Payments on the payment plan?

22   A.    Right.

23   Q.    Right.

24         MR. BAYARD:  Objection, Your Honor.  The only

25   evidence of a payment plan is in relation to the home.

1    There's no evidence that there was a payment plan on the

2    vacant lot.

3                   THE COURT:  Overruled.  That's a subject for

4    cross-examination.

5    BY MR. BOURASSA:

6    Q.    But basically the point, though, here, Ms. Ellis, if

7    you were making payments on this property, you would have

8    expected that number to have gone down, right?

9    A.    Correct.

10   Q.    And if you weren't making payments it would have

11   gone up?

12   A.    Correct.

13   Q.    And it's the same.  Do you have any explanation for

14   that?

15   A.    No, I don't.

16   Q.    Okay.  Did you -- I guess at this point in time you

17   already had the attorney in November 17, 2008, right?

18   A.    Yes.

19   Q.    Okay.  Again, this is -- the date we're dealing with

20   on Exhibit 27 is November 17, 2008.

21                   Let's look at Exhibit 26.  Do you recognize that

22   document?

23   A.    Yes, I do.

24   Q.    What is it?

25   A.    Notice of Trustee's Sale.  Can I see the top?  Is

1    there a -- yeah.  So it's another lien.

2    Q.    Okay.  And this is on the Flowering Sage Trail

3    property?

4    A.    Yes.

5    Q.    And the date on this down at the bottom is

6    November 20, 2008, correct?

7    A.    Correct.

8    Q.    And how much are they asking for in this particular

9    document?

10   A.    $14,478.41.

11   Q.    Okay.  Well, let's put this side by side with

12   Exhibit 27.

13            Oh, I'm sorry.  We need to admit that.  I forgot

14   to move the Court to admit Exhibit 26 as an exhibit.

15            THE COURT:  Mr. Bayard?

16            MR. BAYARD:  No objection, Your Honor.

17            THE COURT:  It's admitted.

18        (Plaintiff's Exhibit 26 received into

19        evidence.)

20   BY MR. BOURASSA:

21   Q.    So we've got Exhibit 26 next to Exhibit 27.

22            You can see in Exhibit 27 the amount due and the

23   date of 11/17/2008, correct?

24   A.    Right.

25   Q.    And then look at Exhibit 28.

1           Now, both of these documents -- on Exhibit 28 is

2    $14,478.41.  Do you have any understanding why in three

3    days difference you incurred an additional -- and I'm not

4    going to say the amount, a lot more money in charges?

5    A.    No, I don't.  Absolutely I have no -- they never

6    sent any documentation on any of this.

7    Q.    Okay.  And these are both recorded documents,

8    correct?

9    A.    Yes.  They all are.

10   Q.    And you can tell that how?

11   A.    Because the document numbers up on the right-hand

12   corner.  And they're all on my lot and my house, all of

13   them still.

14   Q.    So that's the recorder's stamp?

15   A.    Correct.

16   Q.    Have you ever been to the recorder's office?

17   A.    Yes, I have.

18   Q.    What did you do there?

19   A.    Looked to see how many more liens I'm getting on my

20   lot.

21   Q.    On the lot as well as the house?

22   A.    And the house, yeah.

23   Q.    How many times have you been to the recorder's

24   office?

25   A.    I haven't been for a year now.  But I used to go

1    every couple months --

2    Q.    Why is that?

3    A.    -- to check to see what's going on.

4    Q.    Why is that?

5    A.    Because a lot of these I was never notified.  They

6    never mailed it, didn't send anything to me certified,

7    nothing.  They just appeared when I went down there and I

8    looked on them on the recorder's.

9    Q.    All right.  Back on Exhibit 26, do you see the total

10   of the total amount, the 500 -- or, excuse me, $5,685 and

11   the additional $50.  Do you have any understanding of what

12   that amount is supposed to represent?

13   A.    Well, I guess collection and attorneys' fees.

14   Q.    That's what it says.  Do you know what they actually

15   incurred or on what issues?

16   A.    No.  I have no documentation that shows.  No

17   breakdown of any of this.

18   Q.    All right.  Let's look at Exhibit 14, please.

19         Do you recognize that document?

20   A.    Yes.

21   Q.    How do you recognize that document?

22   A.    Well, it's a lien.

23         Can you make it a little bit bigger?  Yeah,

24   thank you.

25   Q.    What does it say at the top?

1    A.    On 12/16/2008.  It's document number 3712947.  So

2    it's another lien.

3    Q.    That's what it says at the very top.

4    A.    Oh, Release of Notice of Delinquent -- okay.  So

5    this is a -- they released a lien.

6          MR. BOURASSA:  Hold on.  Let's go ahead and move

7    it into evidence, so the jury can see it, as 14.

8          MR. BAYARD:  No objection, Your Honor.

9          THE COURT:  It's admitted.

10         (Plaintiff's Exhibit 14 received into

11         evidence.)

12   BY MR. BOURASSA:

13   Q.    All right.  So this relates, again, to the Flowering

14   Sage Trail property, right?

15   A.    Yes.

16   Q.    Okay.  And it's dated with a notary stamp December

17   12, 2008, at the bottom?

18   A.    Yes.

19         MR. BOURASSA:  Mr. Blackburn, could you blow up

20   the first paragraph of that.

21   BY MR. BOURASSA:

22   Q.    So do you have an understanding as to what that

23   means --

24   A.    Yes.

25   Q.    -- what this document means?

1    A.    Yes.  They are -- yeah.  Hold on a sec.  The

2    document 3544004 recorded back on June 14th, 2007, by

3    Alessi Trustee Corporation, they are taking that lien off

4    my property.

5    Q.    It doesn't just say taking it off, it says it's

6    satisfied, right?

7    A.    Yeah, it does say that.  It says satisfied and

8    released.

9    Q.    Do you have an understanding why they would have

10   released that lien?

11   A.    Yes.

12   Q.    And what is that?

13   A.    Because Alessi -- because back in June 14th, 2007,

14   when they -- was the very first lien on my lot and the very

15   first lien on my house, they were known as Alessi Trustee

16   Corporation, and they were not licensed attorneys in Nevada

17   or licensed collection agencies.  So they had no right to

18   lien anybody's property.

19            MR. BAYARD:  Your Honor, objection.  Move to

20   strike her answer as inadmissible hearsay, speculation, no

21   foundation.

22            THE COURT:  Sustained.

23            Ladies and gentlemen, you should disregard

24   Ms. Ellis's response to that last question.

25            Counsel, I'll allow you to pursue the subject

1   matter further, but the responses need to be to the

2   question.

3            MR. BOURASSA:  Understood, Your Honor.

4            Let's move on to Exhibit 2, please.  My mistake.

5   Let's go to 15, please.  Oh, no, skip 15 as well.  You guys

6   got me confused.  36, 37.

7            Let's go to 32, please.

8   BY MR. BOURASSA:

9   Q.    Do you recognize that document?

10  A.    Yes.

11  Q.    How do you recognize that document?

12  A.    Well, they sent it to me for improper payment.  They

13  received my payment on March 20th --

14  Q.    Hold on.  Hold on.

15  A.    Oh.

16  Q.    Do you recognize it as a --

17  A.    Yes.

18  Q.    -- letter you received?

19  A.    Oh, yes, I recognize it.

20           MR. BOURASSA:  All right.  Let's go ahead and

21  move it into evidence as 32.

22           MR. BAYARD:  No objection, Your Honor.

23           THE COURT:  It's admitted.

24       (Plaintiff's Exhibit 32 received into

25       evidence.)

1     BY MR. BOURASSA:

2     Q.    All right.  This letter is dated July 7, 2009, and

3     it relates to the Flowering Sage Trail property, correct?

4     A.    Correct.

5     Q.    And could you explain to me then your understanding

6     of this letter?

7     A.    It's confusing.  Our office -- can I read it?

8     Q.    Sure.

9     A.    Okay.

10              Our office has received your payment dated

11         March 20th, 2009, in the amount of $210.

12              And then we must -- and then it says:

13              We must therefore make a demand on the total

14         current amount due of $15,371.14.  Payment must be

15         in our office by July 22nd, 2009, and must be in

16         the form of cashier's check.

17              Do you want me to read the whole thing?

18    Q.    No.  No.  It's a demand for $15,371.14, correct?

19    A.    Yes.

20    Q.    Did you believe at the time that you received this

21    letter that that was an accurate accounting of the monies

22    that you owed the association for Flowering Sage Trail?

23    A.    No, that is not an accurate amount.

24    Q.    Does that letter contain a statement that this is a

25    communication from a debt collector?

1    A.    No, it does not.

2    Q.    Does it contain any statement that any information

3    it obtained will be used for the purpose of collecting a

4    debt?

5    A.    No, it does not have that.

6    Q.    All right.  All right.  Let's look at Exhibit 16,

7    please.

8             Do you recognize that document?

9    A.    Yes.

10   Q.    What is it?

11   A.    It's a demand for money.

12   Q.    Okay.

13   A.    For payment.

14   Q.    Did you receive that letter?

15   A.    Yes.

16   Q.    All right.

17            MR. BOURASSA:  Let's move 16 into evidence, Your

18   Honor, please.

19            MR. BAYARD:  No objection, Your Honor.

20            THE COURT:  It's admitted.

21         (Plaintiff's Exhibit 16 received into

22         evidence.)

23   BY MR. BOURASSA:

24   Q.    Now, the date on this letter looks like it's

25   July 28, 2009.

1    A.    Correct.

2    Q.    So that's, gosh, 21 days after the July 7, 2009,

3    letter; is that right?

4    A.    Yes.

5    Q.    What's the amount that's demanded in this letter?

6    I'm sorry.  Strike that.

7              What's the amount demanded in 16?  That is the

8    July 28, 2009, letter.

9    A.    $15,871.14.

10   Q.    Okay.  And do you recall the July 7, 2009, letter

11   requesting $15,371.14?

12   A.    Yes.

13   Q.    Do you have an understanding as to what the

14   additional charges were in that 21-day period, between the

15   first letter and the second?

16   A.    I do not.

17   Q.    Also, I note that looking at Exhibit 16 it only

18   shows as of July 28, 2009, payments received of $210.  Is

19   that accurate?

20   A.    No.

21   Q.    Why is that not accurate?

22   A.    Because as of January 2009 I made each payment

23   every -- for my house and my lot, every single month all

24   the way until now.  So I don't know what the 210 --

25   Q.    All right.  Let's look at Exhibit 34.

1               Do you recognize that document?

2     A.    Yes.

3     Q.    Is it a letter you received?

4     A.    Correct.

5               MR. BOURASSA:  I'd move Exhibit 34 into

6     evidence, Your Honor.

7               MR. BAYARD:  One second, Your Honor.

8               No objection.

9               THE COURT:  It's admitted.

10          (Plaintiff's Exhibit 34 received into

11          evidence.)

12               MR. BOURASSA:  Thank you.

13    BY MR. BOURASSA:

14    Q.    The date on this letter is July 31, 2009; is that

15    right?

16    A.    Yes.

17    Q.    Okay.  And how much -- how much is Alessi asking for

18    in this demand?

19    A.    $17,521.92.

20    Q.    And that's on the Flowering Sage property as well?

21    A.    Correct.

22    Q.    Do you have an understanding as to why three days

23    after their July 28, 2009, letter asking for $15,871.14

24    Alessi would send you another letter asking for $17,521.92?

25    A.    No, I do not.

1    Q.    All right.  Do you have an understanding as to the

2    substantial difference over those three days?

3    A.    I don't know what it's -- why.

4    Q.    Do you believe that $17,521.92 accurately reflected

5    the amount due and owing on the Flowering Sage as of

6    July 31, 2009?

7    A.    No, it is not the accurate amount.

8    Q.    Do you note at the bottom of Exhibit 34 -- do you

9    see the bottom of Exhibit 34?

10   A.    Now I do, yes.

11   Q.    Do you note the bottom of Exhibit 34, do you notice

12   that now there is a statement that Alessi is a debt

13   collector --

14   A.    Yes, there is.

15   Q.    -- attempting to collect a debt and the information

16   obtained will be for that purpose?

17            All right.  Let's look at Exhibit 37, please.

18   Do you recognize that document?

19   A.    Yes.

20   Q.    Is that a letter sent -- I'm sorry.  Strike that.

21            MR. BOURASSA:  Mr. Bayard, this looks like

22   another letter to you.

23            MR. BAYARD:  It does.  Your Honor, I object to

24   this document on the grounds that it doesn't appear it was

25   ever sent to plaintiff.

1              MR. BOURASSA:  Well, we will withdraw.  I

2    haven't even tried to admit it yet.  So we'll just leave it

3    where it is, my friend, and move along.  How's that?

4              MR. BAYARD:  Sounds like a plan.

5    BY MR. BOURASSA:

6    Q.    All right.  Let's look -- I apologize for that.

7    Let's look at 42.

8              Do you recognize Exhibit 42?

9    A.    Yes, I do.

10   Q.    How do you recognize it?

11   A.    That's another lien.

12   Q.    Okay.

13   A.    On the --

14             MR. BOURASSA:  Your Honor, we move 42 into

15   evidence, please.

16             MR. BAYARD:  No objection, Your Honor.

17             THE COURT:  It's admitted.

18        (Plaintiff's Exhibit 42 received into

19        evidence.)

20   BY MR. BOURASSA:

21   Q.    What property does this relate to?

22   A.    1200 Broken Feather Court.

23   Q.    I'm sorry.  That's the mailing address.  The

24   property address is a little higher than that.

25   A.    Oh.  I can't see it on mine.  Oh, there we go.  I'm

1    sorry.  The Flowering Sage.  The lot.

2    Q.    Okay.  And what is the total amount asserted to be

3    due on this particular document?

4    A.    $14,441.10.

5    Q.    And what is the amount that represents the

6    collection fees and interest fees?

7    A.    14,000 -- just a minute.  I'm sorry.  As of the

8    total of this represents -- oh, $1,392.14.

9    Q.    I'm sorry.  I want to understand that -- they're

10   saying the total due is $14,441.10, right?

11   A.    Oh, I see.  Oh, my God.  Okay.  Yes, 14,441.10 is

12   the lien.  But of this total amount, $14,385.20 represents

13   attorneys' fees.

14          MR. BAYARD:  Objection, Your Honor.

15   Mischaracterizing the document.  That's not what it says.

16          MR. BOURASSA:  Best evidence rule, Your Honor.

17   It says what it says.

18          THE WITNESS:  I just can't see it when it gets

19   big and small.

20          THE COURT:  Well, it's a misstatement of the

21   exhibit.  But the amount that's set forth in the exhibit is

22   admissible.

23          And the Court will let that stand at that as

24   well as any other amounts that may appear in there.

25

1   BY MR. BOURASSA:

2   Q.    So on its face this document says that you owe

3   ArrowCreek Homeowners Association $14,441.10.  Is that

4   accurate?

5   A.    That's not accurate.  But that's what it says on

6   this.

7   Q.    Okay.  And do you have any understanding of how

8   Alessi is then asserting that of the $14,441.10 they've

9   incurred $14,385.20 in collection and/or attorneys' fees,

10  assessments, interest, late fees, and service charges?

11  A.    I don't have any -- I don't have any documentation

12  to know where that numbers come from, for their attorneys'

13  fees.

14  Q.    And do you have any understanding of what $1,392.14

15  for collection costs is under any allocation whatsoever?

16  A.    No, I do not.

17  Q.    As you sit here, as of August 19, 2013, is this the

18  last lien that was placed on the Flowering Sage Trail

19  property?

20  A.    Yes, I think so.

21  Q.    Is it accurate in the slightest?

22            MR. BAYARD:  Objection, Your Honor.

23            THE WITNESS:  No, it's not.

24            MR. BAYARD:  Leading, argumentative.

25            THE COURT:  Sustained.  The question and answer

1    will be stricken.

2              You may rephrase the question, Mr. Bourassa.

3    BY MR. BOURASSA:

4    Q.    How much money do you think you owe on the Flowering

5    Sage Trail property as of August 19, 2013?

6    A.    August 19, 2014?

7    Q.    2013 is the date on this.  Do you have any idea?

8    A.    No.

9    Q.    But you know it's not $14,000, right?

10   A.    Correct.

11   Q.    All right.

12             MR. BOURASSA:  Your Honor, do you want me to use

13   the last four minutes?  I can.  Or if you'd like to -- this

14   is an appropriate --

15             THE COURT:  If this is a good time for a break

16   in subject matter, let's go ahead and --

17             MR. BOURASSA:  It is, Your Honor.

18             THE COURT:  -- adjourn for the evening.

19             All right.  Ladies and gentlemen, particularly

20   when we're going through this kind of evidence, it's

21   difficult for everyone to know, and so I think it's

22   probably appropriate to go ahead and take our recess for

23   the evening.  But let me give you the admonition because

24   this is very important.

25             I remind you that during our recess you are not

1    to discuss the case with anyone or permit anyone to discuss

2    it with you or in your presence.  You can talk to your

3    fellow jurors about other things, but until the case is

4    submitted to you and you retire to the jury room and

5    deliberate and decide on a verdict, you're simply not to

6    discuss the case or the evidence that's being presented in

7    any way.

8           This caution includes not discussing it outside

9    the courtroom, of course, not discussing it with family

10   members or with anyone else or discussing it over the

11   Internet in any way through either e-mails or text

12   messaging.

13          Secondly, you're clearly not to read, watch, or

14   listen to any report or commentary on the case by anyone or

15   any medium of information.  This certainly includes

16   newspapers, television, radio, or Internet.  Although I

17   don't believe that any of them are following this.

18          Third, do not try to do any research or make any

19   independent investigation on your own concerning this case.

20   As I mentioned to you earlier, it's important that each one

21   of you decide this case based purely on the evidence that's

22   presented in the courtroom that you all have heard and

23   seen.  And anything else, of course, would be inadmissible

24   and inappropriate to consider.

25          Finally, keep an open mind until you've heard

1    all the evidence, heard all the witnesses, received all the

2    evidence that will be presented, and you've heard the final

3    instructions by the Court and the final arguments by the

4    attorneys.

5             If you have taken notes, and I've noticed that

6    some of you have, please be careful to leave your notes in

7    the jury deliberation room.  They are protected there.  No

8    one else will have access to them.  And they will be there

9    for you when you return in the morning.

10            These admonitions continue throughout this

11   trial, by the way, I should emphasize to you.

12            And I will tell you that we will start promptly

13   at 8:30 in the morning.  If you arrive a little early,

14   we'll have some refreshments in the jury room for you, some

15   donuts or other -- I'm not sure what they're getting for

16   goodies these days.  But there will be something there, I'm

17   sure.

18            So at this time I thank you for your attention

19   this afternoon.  I appreciate it.  As I mentioned, I know

20   this kind of evidence can be challenging.  I appreciate the

21   very keen interest I've seen by the jury and all of the

22   evidence that is being presented.

23            So we'll adjourn for this evening at this time.

24   And you may go ahead and step down.  Thank you.

25            COURTROOM ADMINISTRATOR:  Please rise.

1          (The proceedings adjourned at 4:57 p.m.)

2                          *    *    *


161

1                              -o0o-

2         I certify that the foregoing is a correct

3     transcript from the record of proceedings

4     in the above-entitled matter.

5

6     _____     2/17/15

7     Donna Davidson, RDR, CRR, CCR #318     Date
      Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2    PLAINTIFF'S WITNESSES:                          PAGE
     MELINDA ELLIS
3        Direct Examination By Mr. Bourassa          65

4

5                     E X H I B I T S

6    PLAINTIFF'S                               ADMITTED
     3, page 1                                      138
7    4                                              102
     5                                               83
8    8, page 1                                      132
     9                                               86
9    10                                              94
     12                                              90
10   14                                             146
     16                                             150
11   25                                             112
     26                                             143
12   27                                             140
     29                                             110
13   32                                             148
     34                                             152
14   38                                             124
     40                                             127
15   41                                             130
     42                                             154
16   56                                              97
     57                                              98
17   58                                             100
     59                                             106
18

19

20

21

22

23

24

25